IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 2004 Session

## JUDY KESTERSON v. BRUCE VARNER

**Appeal from the Chancery Court for Williamson County**
**No. II-26072      Russ Heldman, Chancellor**

**No. M2003-00743-COA-R3-CV - Filed January 27, 2005**

Bruce Varner seeks review of the trial court's dismissal of his Petition to Modify Custody. The trial court dismissed the petition at the close of the petitioner's proof, holding that petitioner had failed to carry his burden of proof that a change of custody was in the best interest of the child. The trial court assessed attorney's fees and costs to the petitioner. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

Penny Harrington, Nashville, Tennessee, for the appellant, Bruce Varner.

P. Edward Schell, Franklin, Tennessee, for the appellee, Judy Kesterson.

### OPINION

Father, Bruce Varner, and Mother, Judy Varner (now Kesterson), were divorced in Pulaski County, Arkansas in September of 1990. The divorce decree awarded Mother custody of the only child born to the marriage, J.V., a male child born on April 5, 1988. The Arkansas divorce decree was domesticated in Williamson County, Tennessee by consent order of September 16, 1999. The order provided for a modification of custody, but the modification of custody did not affect Mother's status as primary custodian.

On January 11, 2002, Father filed his "Petition for Change of Custody" in the Chancery Court for Williamson County asserting that a change of circumstances had occurred since the entry of the divorce decree and that a change of custody was in the child's best interest. The petition alleged that since the divorce decree J.V. had exhibited serious mental and emotional problems evidenced by his diagnosis in 1993, when he was five years old, of Attention Deficit Hyperactivity Disorder; that at the time of the filing of the petition J.V. was suffering from Bipolar Disorder and Oppositional Defiant Disorder; and that J.V. had been hospitalized several times for treatment of mental problems, had been unable to adjust to school discipline, and had severe human relations problems both with his peers and with authority figures.

On February 15, 2002, Mother answered the Petition for Change of Custody admitting the serious mental problems afflicting J.V., but denying that any change of circumstances had occurred and further denying that a change of custody would be in the best interest of J.V.

On June 11, 2002, Father filed a motion for appointment of guardian ad litem asserting in part:

13. A Guardian *ad litem* would be able to review records, talk to psychiatrists and psychologists and school personnel for the sole purpose of discovering what is the best interest of the subject child and without any concern on the part of medical or educational personnel that their remarks or recommendations might be used to advance the interests of a parent rather than the child and, thus, would be able to make a report to the Court that was based upon full disclosure of the records, diagnosis, treatments, and recommendations of professionals.

14. Statements in Mother's deposition reveal that she has continuing bitterness toward Father about matters relating to the divorce and that she and step-father may have a lifestyle predicated in part on the $1,300 per month child support paid by Father.

15. For the aforementioned reasons, Petitioner/Father prays that this Honorable Court will grant his Motion for the appointment of a Guardian *ad litem* for [J.V.] in this cause, and that the Guardian *ad litem* be instructed to obtain information concerning [J.V.]'s plan of treatment and the appropriate facilities available in Mother's community and in Father's community including the educational opportunities provided by the local school boards for a child with [J.V.]'s situation.

16. Petitioner/Father further prays that all costs in connection with this cause, including attorney fees and Guardian *ad litem* fees, be taxed to Mother for the necessity of having to file this pleading to protect the interest of his minor son, [J.V.].

Responding to this petition the court entered an order on June 20, 2002 temporarily postponing the appointment of a Guardian *ad litem* but stating:

The Court is inclined to grant the Motion for the appointment of a guardian ad litem based in part upon the assurances of the Petitioner's counsel that the Petitioner will bear responsibility for the payment of a guardian ad litem's fee. Specifically, counsel for Mr. Varner indicated that her client would be willing to pay a guardian ad litem's fee as long as the fee did not exceed $2,500. In the event the Court appoints a guardian ad litem, Mr. Varner will be required to pay the guardian ad litem up to $2,500, and, at the appropriate time,

the Court will consider whether payment of the guardian ad litem's fee should be apportioned between the parties.

By order of July 26, 2002, R. Reid Street was appointed with instructions from the court to "obtain information concerning the plan of treatment for [J.V.]'s psychiatric condition. Such information shall include the appropriate facilities available in the petitioner's community and in the respondent's community, particularly the educational opportunities provided by the local school boards for a child with [J.V.]'s situation."

Non-jury trial was held February 10 and February 13, 2003 on the issues drawn by the pleadings, "upon the testimony of witnesses, the report of the guardian *ad litem*, Roger Reid Street, Jr., the evidentiary depositions filed by the parties, the arguments of counsel and the record as a whole." The court held in pertinent part:

> 2. The Petitioner, Bruce Varner, failed to prove that a substantial and material change in circumstances has occurred which is sufficient to warrant a change of custody in this case.
> 3. The Petitioner, Bruce Varner, failed to prove that the best interests of the child require a change of custody.
> 4. The Court finds that the best interest of the child require that he continue to be under the absolute care, custody and control of the Respondent, Judy Kesterson, and that there is no credible evidence in the record to support a finding that Ms. Kesterson's parenting skills have contributed to the problems experienced by the minor child, Jason Varner.
> 5. The Petition to change custody is dismissed.
> 6. The Respondent, Judy Kesterson, is granted a judgment against the Petitioner, Bruce Varner, for reasonable attorney's fees she incurred in this matter in the amount of $25,160. The Court approves and adopts the Affidavit for Attorney's Fees filed by Respondent's counsel.
> 7. The Petitioner, Bruce Varner, is ordered to pay all of the Guardian *ad litem's* fee in the amount of $7,975.50. The court approves and adopts the Affidavit filed by Mr. Street.

This order was entered on February 19, 2003 and Father filed a timely appeal.

The issues stated on appeal by Father are:

> Whether the Trial Court erred in granting Appellee's Motion to Dismiss at the conclusion of the Appellant's case when the stated basis for the dismissal was a "best interests of the child" analysis although the Court had not made findings of fact as to the existence of a material change in circumstance.

Whether the Trial Court erred by failing to make findings of fact underlying the custody determination as required by Tennessee Code Annotated § 36-6-101.

Whether the Trial Court erred by failing to order the implementation of a Parenting Plan pursuant to § 36-6-[401] and by failing to consider the requirements of a Parenting Plan pursuant to § 36-6-404.

Whether the Trial Court erred by failing to find a material change in circumstance has occurred when a child is diagnosed by multiple psychiatrists and psychologists as suffering from a major mental illness and requires long term hospitalization and treatment and treating psychologist testifies that child could improve with Appellant.

Whether a Trial Court may order a party to litigation to pay the attorney fees and costs of the opposing litigant without specific statutory authorization for the order.

Whether a Trial Court may order a party to litigation to pay the entire fees and costs of a Guardian *ad litem* appointed by agreement of the parties and without the opportunity for a hearing on the submitted affidavit or on the relative ability of the parties to pay.

Whether the language of *Tennessee Code Annotated § 36-6-101* as it existed at the time of filing of the Petition is controlling or whether the language of the amended statute in effect at the time of the hearing is controlling.

## A.    Change of Circumstances

At trial, Mother asserted the applicability of the rule in *Musselman v. Acuff*, 826 S.W.2d 920 (Tenn.Ct.App. 1991) and *Wall v. Wall*, 907 S.W.2d 829 (Tenn.Ct.App. 1995) that in order to effect a change of circumstances the non-custodial parent must show that "continuation of the adjudicated custody will substantially harm the child."  *Wall*, 907 S.W.2d at 834.  Father asserted that Chapter 859 of the Public Acts of 2002, effective July 15, 2002, and codified as Tenn. Code Ann. § 36-6-101(a)(2)(B) alters the *Musselman/Wall* rule in that by the terms of the statute "a material change of circumstance does not require a showing of a substantial risk of harm to the child."

As we addressed these issues in detail quite recently in *Laurie Ann Searcy v. Sandy Lee Searcy*, No. M2003-00036-COA-R3-CV, 2004 WL 2866973 (Tenn. Ct. App. Dec. 13, 2004), we reiterate the analysis:

> While this modification of custody and visitation Petition was making its way through the trial court, the standard to be applied in

-4-

determining whether or not a change of circumstances had occurred was undergoing both a common law and a statutory metamorphosis, as *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), *Cranston v. Combs*, 106 S.W.3d 641 (Tenn. 2003), and the legislative enactment of Chapter 859 of the Public Acts of 2002 were running essentially simultaneous and parallel courses with the trial court proceedings in this case. The trial court applied a variation of the "substantial risk of harm" standard in its November 20, 2002 dismissal of this Petition for modification. We will discuss the metamorphosis of the rule at the outset.

Appellate decisions in recent years reflect much controversy as to what "change of circumstances" means in the context of a petition to modify an existing custody order. While there has never been any question but that the burden of proof in such a proceeding rests upon the non-custodial parent to prove that a change in circumstances has occurred, the controversy centers around what one must prove in order to establish a change of circumstances. In *Dailey v. Dailey*, 635 S.W.2d 391, 393 (Tenn.Ct.App. 1981) this Court observed:

> We agree that it is a well-settled principle in this jurisdiction that where an award of custody of a minor is made which has no restrictions or limitations it will support a plea of *res judicata* and to justify a petition for a change in custody there must have been such a change in circumstances as will directly affect the welfare of the minor.

In 1991, however, this Court held:

> The paramount consideration in a custody proceeding is the best interest of the child. When the issue before the Court is whether to modify a prior custody order, it need not repeat the comparative fitness analysis that is appropriate at the time of the original custody degree. *See e.g., Bah v. Bah*, 668 S.W.2d 663 (Tenn.App. 1983). Instead, in a modification proceeding, the trial judge must find a material change in circumstances that is compelling enough to warrant the dramatic remedy of changed custody. *See*, Tenn. Code Ann. § 36-6-101(a); *Woodard v. Woodard*, 783 S.W.2d 188 (Tenn.App. 1989); *Dailey v. Dailey*, 635 S.W.2d 391 (Tenn.App. 1981). Moreover, the burden

is on the non-custodial parent to prove changed circumstances.

*Musselman v. Acuff*, 826 S.W.2d 920, 922 (Tenn.Ct.App. 1991).

Thereafter, in a number of cases, this Court has followed the lead of *Musselman v. Acuff* in establishing that change of circumstances requires proof that such a change is necessary to prevent substantial harm to the child.

In order to be compelling enough to warrant the dramatic remedy of changed custody, the change of circumstances must be such that "continuation of the adjudicated custody will substantially harm the child." *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn.App. 1995). When the requested modification is based on the behavior of the custodial parent, such behavior must clearly posit or cause danger to the mental or emotional well-being of the child. *Musselman v. Acuff*, at 924. We also are mindful that custody decisions should not be designed to punish one parent or to reward the other. *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn.App. 1995). Instead, our paramount concern remains the welfare and best interest of the minor child. *In re Parsons*, 914 S.W.2d 889, 893 (Tenn.App. 1995).

This court has discussed "changed circumstances" as follows:
This decision [regarding custody] is not changeable except for "change of circumstances" which is defined as that which requires a change to prevent substantial harm to the child. Custody is not changed for the welfare or pleasure of either parent or to punish either parent, but to preserve the welfare of the child. Custody is not changed because one parent is able to furnish a more commodious or pleasant environment than the other, but where continuation of the adjudicated custody will substantially harm the child.

*Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn.App. 1995).

*Thomson v. Thomson*, No. 03A01-9809-CH-00308, 1999 WL 894446, at *8 (Tenn.Ct.App. Oct. 18, 1999).

This same analysis was applied by this Court in *Brown v. Brown*, No. 02A01-9709-CV-00228, 1998 WL 760935, at *8 (Tenn.Ct.App. Nov. 2, 1998). This court said: "In the absence of any competent testimony that a continuation of the current custody

-6-

arrangement presents a danger of substantial harm to Chandler, we decline to disturb the trial court's decision to deny a change of custody." Thereafter, the Court said in footnote:

> The principle enunciated in *Wall v. Wall, supra*, is not at odds with the traditional "best interests" test. Ping-pong custody adjudications are not in a child's best interests. This problem has been addressed with unanimity by *Aaby, Musselman*, and *Contreras*, as well as by *Wall*. *Aaby*, a parental relocation case, specifically held that "Tennessee allows custody to be changed if the behavior of the custodial parent *clearly posits a danger* to the physical, mental or emotional well-being of the child [citation omitted]." [Emphasis supplied]. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1966). *Musselman*, citing *Ballard v. Ballard*, 434 So.2d 1357, 1360 (Miss. 1983), held: "It is only that behavior of a parent which *clearly posits or causes danger* to the mental or emotional well-being of a child . . . which is sufficient basis to seriously consider the drastic legal action of changing custody." [Emphasis supplied]. *Musselman v. Acuff*, 826 S.W.2d 920, 924 (Tenn.App. 1991). *Contreras*, quoting *Sartoph v. Sartoph*, 31 Md.App. 58, 354 A.2d 467, 473 (Md.App. 1976), stated: "The custody of children should not be disturbed unless there is some strong reason *affecting the welfare of the child*. To justify a change in custody, the change in conditions *must have occurred* which affects the welfare of the child and *not that of the parents*." [Emphasis supplied]. *Contreras v. Ward*, 831 S.W.2d 288, 290 (Tenn.App. 1991). These cases are all in accord with the language of *Wall v. Wall, supra*, that, once a valid custody determination is made, such custody is not subject to change unless there is a "change of circumstances . . . which requires a change to prevent substantial harm to the child." *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn.App. 1995). "In short, when all goes well with children, stability, not change, is in their best interests." *Contreras v. Ward, supra*, citing *Sartoph v. Sartoph*.

*Brown*, 1998 WL 760935, at *8 n.3.

In *Richardson v. Richardson*, No. W2000-02374-COA-R3-CV, 2001 WL 687074, (Tenn.Ct.App. June 14, 2001), the Western Section of this Court again followed the *Musselman* and *Wall* rule relative to substantial harm to the child. In a prophetic concurring opinion, Judge Farmer questioned the continued viability of the *Musselman-Wall* standard asserting that: "I am concerned that we have created too harsh a standard by holding that a change of custody will be granted *only* upon a showing that a continuation of the

-7-

adjudicated custody will *substantially harm* the child." *Richardson*, 2001 WL 687074, at \*7 (Farmer, J., concurring).

In 2002, the supreme court, in *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002), in the context of a custody case between a parent and a non-parent, observed: "[A] trial court should apply the standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests." *Blair*, 77 S.W.3d at 148.

Later in 2002, the supreme court expanded upon its *Blair* observation in *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), holding:

> The principal issue in this case concerns the proper standard to be applied to a petition to modify custody from one parent to the other parent. This issue is largely resolved by our recent decision in *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002). *Blair* involved a custody dispute between a parent and a non-parent. We concluded that once a valid order of custody has been issued, subsequent custody modification proceedings should apply the "standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests." *Id.* at 148. As explained in *Blair*, the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id.* at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id.* (citations omitted). We note that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being.

*Kendrick*, 90 S.W.3d at 570.

Finally, in 2003, the supreme court laid to rest any lingering doubt about the demise of the *Musselman-Wall* rule. In *Cranston v. Combs*, 106 S.W.3d 641 (Tenn 2003) that court held:

We granted review to determine whether the Court of Appeals erred in determining that the appellant (father) in this post-divorce case failed to present evidence of a material change of circumstances justifying a change of custody of the parties' two minor children. The Chancellor granted a change in custody from the appellee (mother) after finding that there was a material change in circumstances that presented a substantial risk of harm to the children. A majority of the Court of Appeals reversed, holding that there was no material change of circumstances that presented a threat of substantial harm to the children. After reviewing the record and applying our recent decision in *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), we conclude that a material change of circumstances occurred after the initial custody determination and that the modification of custody was in the best interest of the children. Although the Chancellor and the Court of Appeals did not have the benefit of *Kendrick* in this case, and therefore applied an incorrect legal standard, we affirm the result reached by the Chancery Court. Accordingly, the judgment of the Court of Appeals is reversed, and the judgment of the Chancery Court is reinstated.

. . . .

A majority of the Court of Appeals reversed the Chancery Court's change of custody ruling, concluding that Cranston and Combs "bickering" over visitation did not constitute a material change of circumstances that presented a threat of substantial harm to the children. Indeed, the majority determined that Combs failed to present evidence "rising to the level of substantial harm" to his son and "no actual evidence of any harm at all" to his daughter. The majority therefore concluded that it was unnecessary to apply a comparative fitness analysis. Special Judge Ash dissented, concluding that the Chancery Court properly found that a material change in circumstances existed and properly applied the comparative fitness analysis.

*Cranston*, 106 S.W.3d at 642, 643.

So it was that, in *Cranston v. Combs*, the controlling issue was placed directly before the supreme court contrasting the *Musselman-*

*Wall* rule, as relied on by the majority of this Court, with the less stringent rule asserted in dissent by Special Judge Don Ash.

The supreme court left little doubt as to the controlling rule relative to "change of circumstances."

The appellant, Combs, argues that a finding of "harm" is not a prerequisite to changing an initial custody determination under Tennessee law. The appellant also argues that even if a finding of "harm" is required, the Chancery Court's custody determination should be reinstated because it found a "substantial risk of harm" and concluded that a change of custody was in the best interests of the children.

The appellee, Cranston, argues that the trial court must find "harm" before engaging in a comparative fitness analysis for the purpose of a change in custody determination. The appellee asserts that the Court of Appeals' majority correctly determined that there had been no evidence of a material change in circumstances creating a risk of harm to the children and reversed the Chancery Court's ruling.

Our recent decision in *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), resolves the issues before this Court. We held in *Kendrick* that the modification of a valid order of custody must be based on the " 'standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests.' " *Id*. at 570 (quoting *Blair v. Badenhope*, 77 S.W.3d 137, 148 (Tenn. 2002)).

We clarified that this standard requires the trial court to engage in a two-step process to make its final custody determination. First, the court must determine whether a material change in circumstances has occurred after the initial custody determination. Although there are no bright-line rules for determining when such a change has occurred, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way. *Kendrick*, 90 S.W.3d at 570; *see also Blair*, 77 S.W.3d at 150.

Second, after finding that a material change in circumstances has occurred, the trial court must determine whether modification of

custody is in the child's best interests using the factors enumerated in Tennessee Code Annotated section 36-6-106 (2001).

*Cranston*, 106 S.W.3d at 643-44.

Running a parallel course to the events in *Kendrick, Cranston*, and the case at bar was a legislative initiative that culminated in the enactment of Chapter 859 of the Public Acts of 2002 effective as of July 15, 2002. This Act was not effective as of the June 26, 2002 hearing in the case at bar. It was, however, effective prior to the dispositive Order of the trial court of November 20, 2002.

*Kendrick* and *Cranston* both acknowledged this legislative act, which was codified as Tennessee Code Annotated section 36-6-101(a)(2)(B). In footnote, it is observed in *Cranston*:

> As the parties have noted, the legislature has enacted Tennessee Code Annotated section 36-6-101(a)(2)(B) (2001 & Supp. 2002), which provides:
>
> If the issue before the court is a modification of the court's prior decree pertaining to custody or a residential parenting arrangement, the petitioner must prove by a preponderance of the evidence a material change in circumstance. *A material change of circumstance does not require a showing of a substantial risk of harm to the child.* A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or circumstances which make the parenting plan no longer in the best interest of the child. (Emphasis added).

Although the statute did not become effective until July 15, 2002, *i.e.*, after the proceedings in this case, it reflects that the legislature has likewise clarified that a substantial risk of harm to a child is not required to find a material change in circumstances for the purpose of modifying a custody decree. *See Kendrick*, 90 S.W.3d at 570 n. 5 (discussing the enactment of Tenn. Code Ann. § 36-6-101(a)(2)(B)).

*Cranston*, 106 S.W.3d at 644 n.1.

Thus, both by common law development and by legislative enactment, *Musselman v. Acuff, Wall v. Wall*, and all of their respective progeny as to this issue have been overruled.

-11-

*Laurie Ann Searcy v. Sandy Lee Searcy*, No. M2003-00036-COA-R3-CV, 2004 WL 2866973, **1-6 (Tenn. Ct. App. Dec. 13, 2004).

**B.      Standard of Review of Involuntary Dismissal Under Tenn. R. Civ. P. 41.02.**

The trial court dismissed this petition at the close of petitioner's proof on the grounds that Father had shown no right to relief.  In argument before that court Father asserted, "you must take [the testimony before the court] in the light most favorable to the petitioner on the motion to dismiss at the conclusion of the plaintiff's proof."

The rule provides:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief.  The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all evidence; in the event judgment is rendered at the close of plaintiff's evidence, the court shall make findings of fact if requested in writing within three (3) days after the announcement of the court's decision.

Tenn. R. Civ. P. 41.02(2).

Shortly after adoption of the Tennessee Rules of Civil Procedure, this Court assessed the standard applicable to a ruling on a motion to dismiss at the conclusion of the plaintiff's proof:

> We are of the opinion, however, that in passing upon the motion of defendant to dismiss at the conclusion of complainant's proof, the chancellor is not relieved of the duty of looking to all of the evidence and of taking the strongest legitimate view of it in favor of the opponent of the motion, allowing all reasonable inferences from it in his favor.

*Butts v. Birdwell*, 503 S.W.2d 930, 937 (Tenn.Ct.App. 1973).

This interpretation of Tenn. R. Civ. P. 41.02(2) in *Butts v. Birdwell* was repudiated by the Tennessee Supreme Court in *City of Columbia v. C.F.W. Const. Co.*, 557 S.W.2d 734 (Tenn. 1977).

> The motion authorized by this rule is not to be confused with a motion for directed verdict which is authorized by Rule 50,

Tennessee Rules of Civil Procedure. Motions for a directed verdict are neither necessary nor proper in a case which is being tried without a jury. Motions for dismissal in non-jury cases under Rule 41.-02(2), Tennessee Rules of Civil Procedure, and motions for directed verdicts in jury cases under Rule 50, Tennessee Rules of Civil Procedure, are somewhat similar, but, there is a fundamental difference between the two motions, in that, in the jury case, the judge is not the trier of facts while in the non-jury case he is the trier of the facts. In the jury case he must consider the evidence most favorably for the plaintiff, allow all reasonable inferences in plaintiff's favor and disregard all counteracting evidence, and, so considered, if there is any material evidence to support a verdict for plaintiff, he must deny the motion. But in the non-jury case, when a motion to dismiss is made at the close of plaintiff's case under Rule 41.02(2), the trial judge must impartially weigh and evaluate the evidence in the same manner as though he were making findings of fact at the conclusion of all of the evidence for both parties, determine the facts of the case, apply the law to those facts, and if the plaintiff's case has not been made out by a preponderance of the evidence, a judgment may be rendered against the plaintiff on the merits, or, the trial judge, in his discretion, may decline to render judgment until the close of all the evidence. The action should be dismissed if on the facts found and the applicable law the plaintiff has shown no right to relief.

*City of Columbia v. C.F.W. Const. Co.*, 557 S.W.2d at 740.

### C.    Standard of Review as to the Facts

Normally, review of the facts on appeal of a non-jury case is governed by Tenn. R. App. P. 13(d). The findings of fact of the trial court are presumed to be correct unless the evidence preponderates otherwise. *See Berry Hill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000); *see also Farrar v. Farrar*, 553 S.W.2d 741, 743 (Tenn. 1977). In cases such as the case at bar where the trial court has made no findings of fact, review of the facts is *de novo* on the record before the court without any presumption of correctness. *Brooks v. Brooks*, 982 S.W.2d 403, 404 (Tenn. 1999). The reason for such rule is "since the trial court made no findings of fact, there is nothing in this record upon which the presumption of correctness contained in Tenn. R. App. P. 13(d) can attach." *Kelly v. Kelly*, 679 S.W.2d 458, 460 (Tenn.Ct.App. 1984).

### D.    The Petitioner's Burden

The burden of proof is on the petitioner to establish that a material change of circumstances has occurred; that he or she is comparatively more fit than the party with custody under the challenged custody decree; and that it would be in the child's best interest for the moving party to become the custodial parent. *See Hoalcraft v. Smithson*, 19 S.W.3d 822, 830 (Tenn. Ct. App. 1999). The relevant considerations in determining whether or not a change of circumstances has occurred

-13-

are: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way. *Kendrick*, 90 S.W.3d at 570, *Cranston*, 106 S.W.3d at 644; *see also Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002).

After the original custody decree was entered in this case, the child was diagnosed in the ensuing years to be suffering from Attention Deficit Hyperactive Disorder, Oppositional Defiant Disorder, Depressive Disorder and Bipolar Disorder. No evidence in the record indicates that at the time of the original custody decree either of the parties were aware of any potential for the development of these serious mental problems. The behavior of J.V., exhibited in school and otherwise, and established by the expert testimony to be consistent with his mental disorders, obviously affects the child's well-being in a meaningful way. The preponderance of the evidence clearly establishes a change of circumstance since the entry of the original custody decree. The determinative question is whether or not Petitioner Bruce Varner has established by a preponderance of the evidence that a change of custody is in the best interest of J.V.

At the outset of the hearing Petitioner called R. Reid Street, court-appointed guardian ad litem, as a witness. The record discloses:

> THE COURT: It might be good for the Court to ask this preliminarily. Ms. Harrington, do you have any objection to the Guardian-Ad-Litem report being admitted into evidence as an evidentiary item?
> MS. HARRINGTON: No, I do not. In fact - -
> THE COURT: Mr. Schell?
> MR. SCHELL: No, objection.
> THE COURT: Be marked as Exhibit No. 1. And I will let the clerk recover it from the file and that will be marked as Exhibit No. 1 for evidence.

The record reflects that the thoroughness and completeness of the report of the guardian ad litem did not go unnoticed by the parties or the court.

> Q. Did you try to follow the course of treatment that [J.V.] followed beginning in the fall of 2001?
> A. What I did, I got all the records - - the records were provided to me by you, Ms. Harrington, and Mr. Schell. And I participated in some of the depositions. And then I obtained some records on my own from the present physician that he has. And since - - you want me to go through the treatment, what's taken place since fall of 2001?
> Q. I think you're being very helpful to the Court.
> A. Well my report - -
> Q. It would save us a little time?
> A. My report details that in the history and I will have to refer to it.

-14-

THE COURT: You may. It is a very good report, very thorough, Mr. Street. The Court is very pleased with your work.

The report of the guardian ad litem provides, in part:

Following the divorce, Ms. Kesterson (Varner) was remarried on January 12, 1990, to Dr. Robert Kesterson and Mr. Varner was remarried on February 24, 1990, to Laura Varner. Ms. Kesterson has had continuous custody of [J.V.] since her remarriage with the exception of a three (3) month period from December, 2000, to March, 2001, when [J.V.] lived with Mr. Varner in Chicago. [J.V.] was initially diagnosed as ADHD in 1993. Since that time he has been treated by a number of physicians, psychologists and psychiatrists. During the period of time from 1993 to 1998 [J.V.] continued to have problems at school and at home, and during this period of time various medications were used with Ritalin being the most prevalent. During this period of time from 1993 to 1998, there were periods of summer visitation with Mr. Varner and periods of Christmas visitation; however, no spring break visitation is ever exercised by Mr. Varner. In the fall of 1998, [J.V.] began attending Grassland Middle School and he began encountering problems while at the school. Until Christmas 2000, [J.V.] was involved in a number of instances of inappropriate behavior which created significant problems. During this period of time [J.V.] was under the treatment of Dr. Vedavyara B. Biliyar, M.D. and it was while under the treatment of Dr. Biliyar that he suggested [J.V.] go to live with his father for a period of time. The parties discussed the situation and it was agreed that in December, 2000, [J.V.] would live in Chicago with his father. While living in Chicago [J.V.] made one (1) visit to Franklin after which he ([J.V.]) accused his step-father, Robert Kesterson, of abusing him after returning to Chicago. [J.V.] remained in Chicago until spring break 2001, when he returned to Franklin for a visit. Following this visit Ms. Kesterson refused to allow [J.V.] to return to Chicago. It was her position and opinion that [J.V.]'s condition had deteriorated while in Chicago and that it was in his best interest to remain in Tennessee. During the period of time April to September, 2001, [J.V.] lived with his mother and step-father but his condition apparently continued to go downhill until late September when Ms. Kesterson admitted [J.V.] to Vanderbilt Psychiatric Hospital. Immediately prior to this admission [J.V.] had been sent to the Williamson County Alternative Learning Center. Further, [J.V.] had been threatening his brother and according to Ms. Kesterson was doing other "bizarre things." While in Vanderbilt Psychiatric Hospital [J.V.] was treated by Dr. Charles Corbin who gave him a diagnosis of: (1) Bipolar Disorder, Manic; (2) Attention Deficit

-15-

Hyperactivity Disorder, and, (3) Oppositional Defiant Disorder. Also, Dr. Corbin noted that [J.V.] was "continuously manipulative, impulsive and difficult to guide and treat." Dr. Corbin further recommended a long-term residential treatment center. However, after his release from Vanderbilt Psychiatric Hospital [J.V.] was sent back to the Williamson County schools' Alternative Learning Center where he remained for approximately the next three (3) weeks. [J.V.] continued to have problems at the ALC and it was recommended that he receive inpatient hospitalization at Tennessee Christian Medical Center (TCMC). TCMC was chosen apparently because Dr. Biliyar was the medical director. Dr. Biliyar previously had given [J.V.] a diagnosis of: (1) Attention Deficit Hyperactive Disorder; (2) Oppositional Defiant Disorder-Mild; and, (3) Depressive Disorder not otherwise specified. After a one (1) week stay at TCMC, [J.V.] was transferred to Peninsula Village Treatment Center in Louisville, Tennessee for approximately nine (9) weeks. While at Peninsula Village [J.V.] was given a diagnosis of:(1) Bipolar Disorder - Not Otherwise Specified, Most Recent Phase Mixed; (2) Oppositional Defiant Disorder, and, (3) Ruleout Parent/Child Relationship Problems. It subsequently was determined by the Peninsula Village staff that this facility was not an appropriate place for individuals with problems such as [J.V.]s. Accordingly, Ms. Kesterson and her husband began searching for another facility.

The Devereux Florida Treatment Facility in Viera, Florida was determined to be an appropriate placement and [J.V.] was transferred to that facility on January 12, 2002. [J.V.]'s diagnosis at the time of admission was: (1) Dysthymia; (2) Attention Deficit Hyperactivity Disorder, Combined Type; (3) Oppositional Defiant Disorder, and, (4) Ruleout Psychiatric Disorder NOS. [J.V.] remained at this facility until May 31, 2002, when he was discharged with a discharge diagnosis similar to the admitting diagnosis. Also, at the time of discharge [J.V.] was on two (2) medications, Ritalin and Tagamet, and he was discharged to the care of Ms. Kesterson. Upon his return to Tennessee [J.V.] was referred to Youth Villages for followup counseling following his inpatient treatment. [J.V.] began his freshman year at Franklin High School in August, 2002, and has now completed his first semester at Franklin. Further, since June, 2002, [J.V.] has been under the treatment of Dr. Gilbert Raulston, M.D. Dr. Raulston initially stated that [J.V.] met the criteria for ADHD - Combined Type as well as Oppositional Defiant Disorder. In June, 2002, he stated that he was a "bit reticent" to make a diagnosis of Bipolar Disorder, however, on October 28, 2002, it appears from his treatment notes that a diagnosis of Bipolar Disorder - Mixed was made.

Review of the record and the depositions of all of the expert medical witnesses establishes that the guardian ad litem has succinctly and accurately portrayed the history of a very bright young man with serious mental problems. Both Bruce Varner and his present wife, Laura Varner, on the one side, and Judy Kesterson and her husband, Dr. Robert Kesterson on the other feel strongly that they provide the best hope for the future of J.V. The record, however, is replete with evidence that a very intelligent child is manipulative to the extreme and will resort to practically anything to accomplish his desires.

Dr. James Guy Wellborn, a practicing clinical psychologist in Williamson County, began working with J.V. on June 20, 2001, thereafter meeting with both J.V. and the Kesterson family and by telephone with Mr. Varner. When counsel for Mr. Varner ventured an observation that the Kestersons were simply "worn out" with the child, Dr. Wellborn responded:

> What I would say about [J.V.] is it is difficult for me to imagine a parent who would not be exhausted by this kid regardless of their view about feistiness being a desirable thing or high energy or that kind of business in the experience that I've had with him both in the school setting and individually and with the family.

Dr. Wellborn further testified on cross-examination:

> Q. In your treatment of [J.V.], did you find him to be manipulative?
> A. Yes.
> Q. Confrontational?
> A. He's remarkably successful in it because he's very bright and so . . .
> Q. Did you get the impression that he was playing his parents off of one against each other?
> A. Yes.
> Q. Meaning Mr. Varner and Ms. Kesterson.
> A. Everybody. He played everybody. He played the Kestersons off each other. He played his mom and stepdad against his dad and stepmom. He played the teachers. Oh, yeah, this is like -- this is expectable; that's not unusual.
> Q. And when it was reported to you that [J.V.]'s behavior in Illinois was essentially the same as it was when he was here, did that surprise you to hear that?
> A. Oh, no.
> Q. Would you have been surprised if it were otherwise?
> A. Yes. It would have been unexpected given my diagnosis, and given my own understanding in my mind about what I considered to be going on, it would have surprised me.

Dr. Vedavyasa Biliyar, a treating psychiatrist for J.V., defined his behavior in terms similar to Dr. Wellborn.

> Q.    [J.V.] tends to be verbally aggressive in your experience?
>
> A.    Well, periodically. Again, he can be very sweet too. He's a master manipulator.
>
> Q.    That was my next question. Does he tend to manipulate situations?
>
> A.    (Moves head up and down.)
>
> Q.    And is it your impression then that he tends to manipulate both his mother and his father, Mr. Varner?
>
> A.    Yes.
>
> Q.    Does he tend to tell each of them what he thinks they want to hear?
>
> A.    Correct. Or what he wants out of them, what he wants them to think at that time.
>
> Q.    You found him to be a young man who tends to exaggerate?
>
> A.    Very dramatic. That's why I put him in the histrionic personality.
>
> Q.    And sometimes his exaggerations are to the point of untruths, in your opinion?
>
> A.    Yes, yes.
>
> Q.    Is it possible to tell whether some of [J.V.]'s problems are genetic as opposed to learning behaviors?
>
> A.    Yes, yes.
>
> Q.    Can you tell us what of his problems you believe are genetic?
>
> A.    The impulsivity - - you know, actually bipolar disorder is a genetic disorder. But I remember dad saying that he's just like [J.V.], therefore, I believe that he had ADHD. But I remember mother saying that she was hyperactive too. He possibly gets it from both sides, the impulse control problem. Now, the bipolar, I don't know, the emotional intensity, I don't know where he got it from.
>
> Q.    Is [J.V.] the kind of child who tends to need more supervision and guidance than your average child?
>
> A.    Oh, yes.

When J.V. entered Peninsula Village Treatment Facility on November 9, 2001, he was treated by Dr. Gregory Gass, staff psychiatrist. Dr. Gass testified:

> Q.    Can you give me some specific examples of behavior or conduct on [J.V.]'s part that was thought to be inappropriate while he was there?

-18-

A.	Okay. He was quite demanding. I can't remember a specific what it was he wanted, but I do remember that there were some - - I'm pretty sure there were some physical restraints that had to do with simply his not understanding that at a certain time things don't happen or that you cannot always have your way.

I know at the time, we had a smaller unit that we had to move a group of patients that were inappropriate for treatment into - - as they were disrupting the unit so badly with things like temper tantrums, and I know [J.V.] tended to do that. He was having quite a few tantrums.

Q.	Did [J.V.]'s behavior improve at all while he was at your facility?

A.	No. Actually, it fluctuated. With the confrontational style we have with simply trying to understand that there are rules to life and consequences with rules, he would get very frustrated.

When he came in, he really wasn't demonstrating any fluctuation in mood state. And I was questioning the diagnosis from the beginning, of the bipolar disorder. It was more based on historical reports and the transfer diagnosis.

So, I had initiated some medication tapers, and the Zyprexa specifically is an anti-psychotic agent that is used also in bipolar disorder for mood stabilization. When I attempted to taper his Zyprexa, we saw a real deterioration in [J.V.]. He not only would become easier just to react to the environment and be frustrated, but his interpretation of it was not quite accurate.

I remember specifically him pointing out that the rest of the world was misperceiving it, he was the only one that was correct. Those aren't his exact words, but that was his perception, was that we were all mistaken and he was the only one correct in his interpretation of reality.

Q.	So, if I understand your testimony correctly, his length of stay there at Peninsula Village was not, or was it, a typical length of stay; is that correct?

A.	No, it was an atypical. We are a long-term treatment facility. Our patients average eight months here. A full course of treatment is more like a year, as it has to do with simply behaviors and personality.

[J.V.] demonstrated some thought disorders. He wasn't willing to attach to other people. His - - And when you look at the supplemental testing, he was organized at a psychotic level in terms of the way he interpreted the world. He was functioning totally - - not totally, but he was functioning primarily with an internal world as opposed to reacting from cues in his environment.

-19-

We can't treat a patient like that here. Actually, our confrontational style could potentially make a patient like that worse. And when we recognize we are dealing with that, we generally refer to a more traditional psychiatric setting that works more with thought disorders and can give more individualized a treatment as opposed to we do more of a group treatment.

On January 22, 2002, J.V. was transferred from Peninsula Village Residential Psychiatric Facility to the Children's Services Center at Devereux, Viera. At this facility he was treated by Dr. Manal Soliman, chief psychiatrist for Children's Services. The testimony of Dr. Soliman deviates very little from the testimony of the other professionals. In response to a question by the guardian ad litem he set forth what appears to be the controlling problem relative to custody.

> Q. If [J.V.]'s custody was changed from his mother to his father and he went to Chicago to live, are you saying that when he had disagreements with his natural father and his stepmother, he would start idealizing his mother and stepfather in Tennessee?
> A. I think that would happen wherever he lived. He could have a disagreement with either set of parents wherever he lived and, he would then idealize the set of parents that he wasn't disagreeing with at the moment. He isn't a malicious person, but the normal - - this normal pitting of one parent against another during this phase of development is exaggerated when the parents are physically not able to be in the same community. That's why it really - - it would be in [J.V.]'s best interest for the parents to talk to one another more.
> Q. When you were involved in this case, did you find that the parents didn't talk to each other regarding [J.V.]'s best interests or just didn't talk to each other?
> A. I found that they were very reluctant to talk to each other. They avoided having any conjoint, that is simultaneous sessions, where they would all be present together. And that is because they're human beings and they were angry at one another. It's unfair, I believe, to expect them to be talking to one another with [J.V.] unless they can first resolve their own issues with each other, and that may mean just agreeing to talk to each other regularly on the phone.

As a petitioner seeking the change of custody, Bruce Varner's major difficulty is the burden of proof to the best interest consideration. He agrees that J.V. is an extraordinarily difficult child. When the parents agreed for J.V. to go to Chicago and try living with his father this behavior continued. J.V. was suspended from Hadley Middle School for disruptive behavior. The continuing behavior and suspension do nothing to bear the burden of proof.

The guardian ad litem made a careful investigation of all of the parties in this case in the course of which he undertook a trip to Chicago and the Glen-Ellyn suburb of Chicago to investigate

school conditions, housing and neighborhood conditions around the home of Bruce Varner. During the course of the guardian's testimony, the trial court inquired as to whether or not he had formulated an opinion as to which parent should assume the primary parenting role.

> THE COURT: My original question is yes or no; do you have an opinion on that issue?
> THE WITNESS: Yes, I have an opinion.
> THE COURT: All right. Do the attorneys have any objection to the Court asking the Guardian-Ad-Litem what his opinion is on that question alone? Mr. Schell?
> MR. SCHELL: No objection.
> THE COURT: Ms. Harrington?
> MS. HARRINGTON: No objection.
> THE COURT: All right, then I'm going to ask this Guardian-Ad-Litem what your opinion is.
> THE WITNESS: Based on what I've seen. Based on what I've studied, it would be my opinion that [J.V.] should stay here. And that's based on the fact that he is doing better in school now. Based on the fact that I feel Ms. Kesterson addresses the issues - - has been addressing the issues of the medical problems that [J.V.] has. And I don't think Mr. [Varner] fully addressed those issues or truly came to the conclusion there were medical problems until very recently.
> THE COURT: So in order to get a direct answer, the direct answer is the mother?
> THE WITNESS: The mother, yes, sir.

The trial court faced a very difficult decision involving a very difficult child. The mental, psychological and emotional problems of this very gifted child defy adequate solution. Both parents are genuinely interested in J.V. and in their differing ways each seeks to do what is in the child's best interest. The preponderance of the evidence supports the decision of the trial judge in leaving custody with the mother. Mr. Varner has simply failed to carry his burden of proof to establish that his care for J.V. as primary residential parent would work any more for the best interest of J.V. than leaving primary residential custody with Mrs. Kesterson.

Mr. Varner complains of the allowance by the trial court of attorney's fees for Mrs. Kesterson and further in taxing the guardian ad litem fee entirely to Mr. Varner. Under Tennessee Code Annotated § 36-5-103(c) the award of attorney's fees is in the discretion of the trial court. *Sherrod v. Wix*, 849 S.W.2d 780 (Tenn.Ct.App. 1992). The allowance, as well, of guardian ad litem fees is discretionary with the trial court. Tenn. R. Civ. P. 54.04. Mr. Varner argues that he did not receive "a reasonable opportunity to prepare his defenses and objections" before the court assessed the GAL fees and opposing counsel's attorney fees against him. For Authority, the Mr. Varner relies upon the following discussion from *Oster v. Yates*:

Employer next insists that it should not have been taxed with employee's trial preparation expenses, consisting of $84.00 for the costs of transcribing Dr. Allen's deposition, $35.00 for a copy of the employee's discovery deposition, $10.00 for a copy of Dr. Allen's medical records and $2.69 for a copy of the first injury report from the Department of Labor.

Tenn. R. Civ. P. 54.04(2) provides as follows:

> (2) A party who desires to recover discretionary costs or any recoverable costs not included in the bill of costs prepared by the clerk of the trial court shall move the court to assess discretionary costs and attach thereto an itemized and verified bill of costs. The affidavit shall be made by the party or his duly authorized attorney or agent having knowledge of the facts, certifying that such items of costs are accurate and were reasonable and necessary to preparation and trial of the case and that the services for which such fees have been charged were actually performed. The motion shall be filed as a post trial motion pursuant to Rule 59.01.

The rule was cited with approval in *Lock v. Nat. Union Fire Ins. Co. of PA,* 809 S.W.2d 483 (Tenn.1991), in which case a post trial motion was filed in strict compliance with Rule 59.01, as required.
In the present case, at the conclusion of the hearing, employee's attorney orally moved to have discretionary costs taxed against the employer. No affidavits were filed and no hearing relative to the reasonableness or necessity of the claimed expenses was held. The matter was not treated as a post trial motion. In short, employer was not given a reasonable opportunity to prepare and present its defenses and objections to the motion. Under these circumstances, we are persuaded that the allowance of discretionary costs was an abuse of discretion.

*Oster, a Div. of Sunbeam Corp. v. Yates,* 845 S.W.2d 215, 217 (Tenn.1992).

*Oster* involved a worker's compensation claim in which the plaintiff, at the close of the hearing made an oral motion for discretionary costs without accompanying affidavits. In this respect the case is distinguishable on its facts from the case at bar. Mr. Varner requested the appointment of the guardian ad litem. The court in its order disposing of the motion put Mr. Varner on notice of the possibility of paying the entirety of those fees. The transcript reveals the following additional exchange regarding the entry of Mr. Street's fee affidavit:

THE COURT: With that regard, Mr. Street, I'll excuse you from the rest of the proceedings. If something comes up requiring your coming back, we'll let you know.

[MR. STREET]: I prepared an affidavit of my time and expenses.

THE COURT: Any objection to it being submitted?

MR. SCHELL: No, sir, I've seen it.

MS. HARRINGTON: No, sir, I've seen it.

THE COURT: All right it will be Exhibit 2.

The albeit unusual form of entry did not prohibit counsel form interposing an objection as to the admissibility or propriety of the exhibit, or attempting to reserve the right to cross-examine the witness at a different point in the proceedings. From a review of the guardian's report and testimony the fees charged were quite reasonable.

As for the attorney's fees, Mr. Schell likewise prepared an affidavit of fees and expenses which the trial court requested in making its ruling. Contrary to his assertion in his brief, the record reveals no effort made on the part of Mr. Varner to object to those fees, or bring any challenge to the trial court alleging error in its consideration of the affidavit. *See* Tenn. R. C.V. P. 59.04; 60.02. In light of this failure to afford the trial court an opportunity to correct any alleged error argued here, we are disinclined to second guess the trial court's exercise of its discretion. *See* Tenn. R. App. 13(d), *see also Barnhill v. Barnhill,* 826 S.W.2d 443, 456 (Tenn. Ct. App. 1991). *Woodlawn Mem'l. Park, Inc. v. Keith*, 70 S.W.3d 691,698 (Tenn. 2002).

The judgment of the trial court is in all respects affirmed and the case is remanded to the trial court for further proceedings. Costs of the cause are taxed against the appellant, Bruce Varner.

_____
WILLIAM B. CAIN, J.