IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 16, 2010 Session

## IN RE: BECKA L. A. K.

**Appeal from the Juvenile Court for Humphreys County**
**No. J-6651-03      Anthony L. Sanders, Judge**

_____

**No. M2009-02405-COA-R3-JV - Filed March 30, 2011**

_____

The trial court allowed the mother of a twelve year old girl to move out of state with the child over the objections of the father and set out a generous visitation schedule so the father could maintain a close relationship with his daughter. Shortly after the move, the father filed a petition for contempt and for change of custody, alleging that the mother had deliberately thwarted his court-ordered visitation to defeat his parental rights. After a hearing, the trial court concluded that the father had proved his allegations, and it transferred custody of the child to him. Since we find that the evidence preponderates against the trial court's findings, we reverse and reinstate the parenting plan in effect before the father filed his petition and remand to the trial court for crafting of a transition plan.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT, JJ., joined. FRANK G. CLEMENT, JR. filed a concurring and dissenting in part opinion.

Connie Reguli, Brentwood, Tennessee, for the appellant, Shannon Kane.

Charles N. Griffith, Waverly, Tennessee, for the appellee, Russell Klein.

### OPINION

### I. A PETITION TO RELOCATE

The child at the center of this dispute, Becka L.A.K., was born on April 30, 1997. Her parents, Russell Klein ("Father") and Shannon Kane ("Mother") lived together prior to and after the child's birth, but never married. Mother also had an older daughter from an earlier relationship. Father and Mother separated when Becka was still quite young. The child

remained in Mother's care after the parties' separated. (Father's attorney stated at trial that the parties' separation occurred in 2000. Mother's attorney stated that it occurred six months after the birth of the child). Father filed the first petition in this case in 2003 or 2004, for the purpose of establishing his paternity. His petition was granted, and an order was filed which included a schedule for Father to exercise visitation and/or parenting time with the child.[1]

The proof showed that Father had a close relationship with his daughter and that he exercised his visitation faithfully. Father acknowledged that Mother never prevented him from seeing the child during the court-ordered visitation periods. Father also asked Mother to allow him additional visitation with the little girl. Sometimes Mother agreed and sometimes she did not. At some point, Mother told Father that she was thinking of moving from Tennessee back to her home town of Jeffersonville, New York. Father was himself also originally from the same area of New York State, and he still had relatives there. However, when Mother suggested that she might move, communication between the parties became strained, and Mother no longer allowed Father to exercise visitation beyond the schedule set out in the existing court order.

On August 25, 2008, Mother sent Father a letter, formally notifying him of her intention to move back to her home town. *See* Tenn. Code Ann. § 36-1-108(a). The letter stated that Mother wished to be closer to her extended family and that the move would allow her to take advantage of some job opportunities in that area. The letter also included a proposed visitation schedule and acknowledged Father's right to file a petition in opposition to the move, but expressed the hope that the parties could work out their differences in a civil manner.

---

[1]Father apparently filed a number of subsequent petitions for the purpose of setting child support and obtaining relatively minor modifications to the visitation schedule. After the notice of appeal was filed in this case, Mother's attorney did not designate any of the earlier petitions or the orders resulting from them as part of the record on appeal. Mother subsequently retained a new attorney, who moved the trial court to supplement the record with those documents and others which her prior attorney had not chosen to include in the appellate record. The trial court denied Mother's motion. Mother's attorney then moved this court to supplement the record. The determination of the trial court on a motion to supplement the record is normally conclusive, except under extraordinary circumstances. Tenn. R. App. P. 24(e). Nonetheless, we granted Mother's motion in part by ordering that the record be supplemented with the transcript of the hearing of February 10, 2009, because we deemed that transcript to be necessary "to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(a). We denied Mother's motions as to the other documents she submitted, and we accordingly refer to those documents and the proceedings arising from them only to the extent that information about them is set forth in other parts of the appellate record. *See* Tenn. R. App. P. 13(c).

Father did not respond directly to Mother's letter, but filed a petition in opposition to removal of the child and for custody. *See* Tenn. Code Ann. § 36-6-108(d). For her part, Mother filed a petition to relocate and to alter visitation, *see* Tenn. Code Ann. § 36-6-108(c), accompanied by a proposed parenting plan that would keep Becka in Mother's care during school, but would allow her to stay with Father during the summer and school holidays. Her attorney stated that the proposed plan would increase Father's parenting time from 90 days a year under the existing arrangement to 95 days a year.

The hearing on the competing petitions was conducted on February 10, 2009. Father and Mother were the only testifying witnesses. Mother testified that she had no family in Tennessee, but that she had many family members in New York whom she missed terribly, including her mother, her brother, her niece and nephews. She further testified to a likely job opportunity in medical billing, the same field in which she had been working in Tennessee, and she asserted that she would be able to stay in a house in Jeffersonville owned by her stepfather if she paid the property taxes and insurance. Mother denied any intention to defeat Father's visitation rights with Becka, stating that "she loves her Dad."[2]

Mother testified that after she sent Father the letter about the proposed relocation, he began asking for additional visitation with the child every single week. She stated that Father never speaks directly to her when he requests more visitation time, but either sends her a text message or communicates through Becka. Mother complained that putting Becka in the middle of those communications makes the child uncomfortable. When he took the stand, Father acknowledged that he communicated with Mother in the manner she described, and stated that he never asked Mother directly for more time "because it always ends up in a disagreement."

Father, testified, however, that he believed the purpose of Mother's proposed move was vindictive, and he pointed to Mother's reluctance to allow him any more visitation time beyond what was ordered by the trial court, and on limitations she placed on his communications with the child. Father stated that "I ask for extra time with Becka all the

---

[2]Tenn. Code Ann. § 36-1-108(d)(1) states that when the parents are not spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, that parent is permitted to do so unless the court finds that at least one of the following three conditions exists:

(A) The relocation does not have a reasonable purpose;

(B) The relocation poses a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or

(C) The parent's motive for relocating the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

time," and he complained that after he gave his daughter a cell phone so she could call him, Mother took the phone away from her, stating that "an eleven year old girl doesn't need a cell phone."

Father also testified at length about the closeness of his relationship to his daughter. Becka was in junior high school at the time of the February hearing and was a straight A student. Father coached her softball team, attended soccer games when she was playing (at some point, Mother was the soccer team coach), and went to band recitals (Becka is a percussionist). Father testified that he even went to his daughter's school to eat lunch with her about twice a month.

At the conclusion of testimony, the trial court announced its decision from the bench. The court commended Father for the interest he has shown in his daughter, but found that there was a reasonable purpose for Mother's proposed relocation, and declared that although "I'm somewhat reluctant in my decision today," she should be allowed to move.

The court declared that it was important for Father to receive all the visitation he needed to maintain his relationship with Becka, and it stated among other things that "I'm thinking that he ought to have almost all the summer, probably six weeks or seven," and that "the cost of transportation for visitation will be divided 50/50." The court noted that the New York school calendar was different from Tennessee's, so while he approved the broad outlines of the visitation schedule proposed by Mother, he asked the attorneys for the parties to get together so they could reach agreement on the details. The court also stated that it didn't see anything wrong with the child having a cell phone so she could text her father. "Of course if she doesn't use it responsibly, that's another story."

Mother moved to New York with Becka on May 30, 2009, after the school year ended in Tennessee. For reasons that are not clear from the record, the final order memorializing the trial court's decision was not entered until August 25, 2009, *nunc pro tunc*, over six months after the hearing. Aside from allowing Mother to relocate, the order declared that "Father has not shown the existence of a material change of circumstances since the entry of the Permanent Parenting Plan," and it accordingly denied his petition for change of custody.

The court's order also declared that "the child shall reside with Mother except when Father has parenting time." Father's listed parenting time included "during summer vacation," the Fall and February breaks from school, alternate Thanksgiving and Easter holidays, and Christmas holidays from December 27 until the resumption of classes. The order stated that "the child's transportation costs associated with visitation shall be split equally between the parents," but also that "Father my (sic) have child on any three-day weekend if he provides for air transportation for the child."

-4-

## II. A PETITION FOR CHANGE OF CUSTODY AND FOR CONTEMPT

The issues on appeal are not directly related to the court's order allowing Mother to relocate, but arose rather from events that occurred after the relocation. On August 12, 2009, Father filed a petition against Mother for contempt, alleging that she had prevented him from exercising all the summer visitation he was entitled to, and that she "has continually frustrated and defied the Orders of this Court." The petition also stated that the child was currently within the State of Tennessee, and it requested that Father be granted temporary custody of the child pending the full hearing of the petition, and that he also be granted "remedial visitation." Father filed an amended petition two days later, asking that custody of the child be changed from Mother to him.

The trial court conducted a hearing on Father's petition on October 13, 2009. The evidence indicated that Mother's relocation had worked out more or less as she had planned. Becka was doing well at school, was playing soccer and had made some friends. Mother's stepfather's house needed some work done before it was fully habitable, so Mother, Becka, and Mother's other daughter had to live in an attic apartment at her brother's house for a few weeks before moving in. Mother initially did some work for her brother, but then obtained a full-time job at a surgeon's office. Although she had only been in New York for a few months by the time of the hearing, she testified that she has already earned a promotion to become the surgeon's hospital billing coordinator.

### A. Summer Visitation

The testimony at trial did not focus as much on Mother's circumstances, however, as on the three separate occasions when Mother allegedly deprived Father of visitation time he contended that he was entitled to. The first of these involved summer vacation. As we noted above, after the court declared that Mother would be allowed to relocate to New York, she chose not to leave immediately, but remained in Tennessee until after the end of Becka's school year.

Mother testified that in the middle of May, Father asked her if he would have visitation in the month of June. She said that she told him July and August would be better, because she would have to take Becka to New York before the end of the school term in Jeffersonville, so the child could take a math placement test, familiarize herself with the local school, and meet some of the other children. She also testified that Father did not object when she told him of her plans. Father complained, however, that Mother did not tell him the exact date she would be leaving Tennessee, and that he had to get the information from Becka. After they moved to New York, Mother made reservations for Becka to fly down to Tennessee for visitation. She sent Father the schedule via e-mail about a week before

Becka's departure date of July 10. The return flight was scheduled for August 23.

Father complained that Mother did not consult with him about the dates and times of the flights, but simply went ahead and bought the tickets without his input. After buying the tickets, Mother asked Father to pay half the cost. Asked if he had paid, Father replied, "Absolutely not!" He testified that he did not believe he should have to pay, because he was not consulted about the schedule ahead of time, and because he would have looked for a flight that was "a whole lot cheaper." Mother testified it was very difficult to deal with Father about the intricacies of scheduling and other matters because for the most part he limited his communications with her to very terse e-mail and text messages.

The 2009-2010 school year in Humphreys County began on August 7. Father testified that he enrolled Becka in school while she was staying with him because that was her wish. He also testified that he told Mother that the child would not be returning to New York, and that she would stay in Tennessee with him. Father did, however, send Becka back to New York on the scheduled date of August 23. The school year in New York begins right after Labor Day, and Becka enrolled on time.

### B. The Labor Day Weekend

A second dispute over visitation involved the Labor Day weekend. Because the final order allowed Father visitation on "any three-day weekend if he provides for air transportation for the child," Father e-mailed Mother and asked her if he could visit her from Friday to Monday of that weekend. Mother e-mailed back that Becka wanted to go on a family camping trip that had been planned before she returned, but that Father would be able to visit with her from Friday night until Saturday night at dinner time. They agreed via e-mail to meet at an ice cream stand in Parksville called "Fiddles."

According to Mother's testimony, however, Becka decided she wanted to participate in some campground activities on Saturday, and she told Mother that she had e-mailed Father that she wanted to be with him on Sunday and Monday instead. Father denied that he received that particular message from his daughter, but he acknowledged that he received an e-mail from her stating, "Daddy, I can't wait to see you Saturday until Sunday," which he disregarded because he assumed she mixed up the days. Father also testified that when he and Mother spoke on the phone before the weekend, Mother mentioned Becka's e-mail about the change of plans, which apparently upset Father greatly: "First of all, Becka's e-mail said Saturday to Sunday. Second, I don't understand why we're making arrangements through Becka when we already made prior arrangements between ourselves."

In any case, after Father arrived in New York, he went to the sheriff's department with the Tennessee court order in hand, and asked the sheriff or a deputy to enforce it. The sheriff said they wouldn't enforce the Tennessee order. Mother testified that she and Becka were waiting for Father at Fiddles on Sunday at 6:00 p.m. but he never showed up. Becka cried and tried to call Father a couple of times while they were sitting there, but did not get an answer. The child left him voice mail and text messages. Father testified that he had made arrangements to go back to work on Sunday night, but he apparently did not communicate that to Mother or to Becka. So Father returned to Tennessee without seeing his child.

## C. The Columbus Day Weekend

The third dispute over visitation involved the Columbus Day weekend. The holiday was observed in 2009 on Monday, October 12. The hearing we are discussing was conducted on Tuesday, October 13. Father e-mailed Mother in September with possible flights for Becka to take in both directions. Mother's e-mail in response said that those flight times would not work, and that visitation was impossible because of the court date. Father's return e-mail asked, "[s]o you want a second contempt charge?"

Mother testified that it was a two and a half hour drive between her home and the airport. The return flight proposed by Father was scheduled to arrive at 8:20 p.m. on October 12. Mother stated it would be unacceptable to have Becka arrive home after midnight on the night before a school day. Since Mother had to be in Tennessee for court on October 13, the logistical obstacles were daunting, to say the least. But Father testified that Mother's refusal to accept his proposed schedule was yet another example of "a pattern over the years of how she consistently denies my visitation to spend time with my daughter."[3] Mother was asked why she didn't bring Becka to Tennessee with her for the hearing, but Mother said that Becka refused to come.[4]

---

[3]As we noted, Father acknowledged during the hearing of February 10, 2009 that Mother did not prevent him from exercising any of this court-ordered visitation while the parties lived in Tennessee. Mother's attorney objected to Father's testimony, however, because it referred to events that occurred before the relocation order was entered. The trial court let the testimony in, although he declared it was for a limited purpose.

[4]The record indicates that the trial court appointed a guardian ad litem for Becka, who testified at the hearing of October 13, 2009 over Mother's objection. Mother argues on appeal that the trial court erred in allowing the Guardian as Litem to testify because Supreme Court Rule 40(f)(1) prohibits such testimony. We do not believe we need address that argument, because the testimony offered did not add anything of value for the purposes of our decision.

At the conclusion of testimony and of closing argument, the trial court announced its decision from the bench. The court praised Father as a rock of stability in Becka's life, and was highly critical of Mother. He stated that her testimony was not credible, and that she did not follow the letter or the spirit of the visitation order. The court also said that "there's no doubt in my mind that she's mean spirited," and observed that just a short time after the court's most recent visitation order "here we are with three big bad violations of court orders." The court also expressed fear that if Mother were allowed to retain custody, she would continue to defy court orders, and the parties would have to come back to court "again, and again, and again, which will certainly not be in the child's best interest."

The court accordingly awarded custody of Becka to Father, and granted Mother a visitation schedule similar to what had previously been granted to Father. The court acknowledged the problem of changing custody right in the middle of the school year, but decided that it was in the child's interest for the change of custody to take place quickly, "within about a week."

The trial court's ruling was memorialized in a final order, which was filed on October 20, 2009. The order stated that "there has been a material change of circumstance since the February 10, 2009 hearing by this Court such that it will be in the child's best interest to be placed in a stable environment with a parent who will not defy and obstruct the Order of this Court as to child visitation," and also that "the Court fears she will continue to obstruct the child visitation arrangements to the point where the child will not know the Father." Mother filed a motion to alter or amend, which the trial court denied in an order filed January 5, 2010. This appeal followed.

## III. ANALYSIS

### A. The Standards for Decision and Review in Custody Modification Cases

A decision on a request for modification of an existing parenting arrangement requires a two-step analysis. *Cranston v. Combs,* 106 S.W.3d 641, 644 (Tenn. 2003). A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest. *Kendrick v. Shoemake,* 90 S.W.3d 566, 575 (Tenn. 2002). Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. *Kendrick v. Shoemake,* 90 S.W.3d at 569; *Blair v. Badenhope,* 77 S.W.3d 137, 150 (Tenn. 2002); *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006).

As to the first requirement, *i.e.*, a material change of circumstances, the Tennessee Supreme Court has stated that,

> Although there are no bright line rules as to whether a material change in circumstances has occurred after the initial custody determination, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston v. Combs,* 106 S.W.3d at 644 (citing *Kendrick v. Shoemake*, 90 S.W.3d at 570)).

The statute governing requests for such a modification provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstances. A material change in circumstances may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B).

The question of whether a material change of circumstances has occurred is a question of fact. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007); *Murray v. Murray*, M2009-01576-COA-R3-CV, 2010 WL 3852218 (Tenn. Ct. App. Sept. 28, 2010)(no Tenn. R. App. P. 11 application filed). Our review of findings of fact in child custody or parenting plan cases is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). Questions of law in civil cases are reviewed *de novo* with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston*, 854 S.W.3d 87, 91 (Tenn. 1993).

We are mindful that "[t]rial courts are vested with wide discretion in matters of child custody" and that "the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). Also, "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly,

appellate courts are reluctant to second-guess a trial court's decisions." *Gaskill v. Gaskill,* 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). But despite the wide discretion that courts are empowered to exercise in such matters, "they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law." *Ibid. See also Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997).

## B. The Trial Court's Findings About Visitation

In its order, the trial court stated it was changing custody in part because, unlike Mother, Father "will not defy and obstruct the Order of this Court as to child visitation." This language might imply that the modification was in the nature of punishment for contempt in failing to follow the court's orders. Indeed, Father had filed a petition for contempt. However, we do not believe that was the basis of the trial court's ruling, because it is well settled that child custody or residential placement cannot be used to punish a parent. *Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. Ct. App. 1997); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App.1991) (stating these decisions are not intended to reward or punish parents); *Hyde v. Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905 *5-6 (Tenn. Ct. App. October 12, 2010) (no Tenn. R. App. P. 11 application filed). "Custody decisions are not intended and should not be designed to reward parents for prior virtuous conduct, nor to punish them for their human frailties or past missteps." *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006); *Kesterson v. Varner*, 172 S.W.3d 556, 561 (Tenn. Ct. App. 2005); *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000). While willful violations of court orders regarding custody and visitation can be sanctioned through the contempt process, punishment cannot be exacted through changing a parenting arrangement, and we do not consider that as the basis for the court's decision herein.

The trial court's findings regarding compliance with the court-ordered parenting arrangement, however, are relevant to other applicable principles. Failure to follow an existing parenting plan or court order regarding custody and visitation can constitute a material change of circumstances. First, as set out above, Tennessee Code Annotated § 36-6-101(a)(2)(B) provides that a material change of circumstances can be shown by "failures to adhere to the parenting plan or an order of custody and visitation." Second, a custodial parent's failure to allow court-ordered visitation by the other parent can constitute a material change of circumstances, largely because it implicates the custodial parent's willingness "to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child." *See* Tenn. Code Ann. § 36-6-106(a); *Cranston v. Combs,* 106 S.W.3d at 645; *In the Matter of Parsons,* 914 S.W.2d 889 (Tenn. Ct. App. 1995); *Rushing v. Rushing*, No. W2003-01413-COA-R3-CV, 2004 WL 2439309 (Tenn. Ct. App. Oct. 27, 2004) (no Tenn.

R. App. P. 11 application filed).

The trial court in this case found that Mother's failure to allow Father to exercise all the visitation he was entitled to under its order of August 25, 2009 was a material change of circumstances. The trial court's conclusion was based on a finding that Mother was guilty of "three big bad violations of the court's order." When we examine the evidence as to the incidents the court referred to, however, we find that it does not support the trial court's characterization. We will discuss each of those incidents in turn, beginning with summer visitation.

In its ruling from the bench at the conclusion of the relocation hearing of February 10, 2009, the trial court described the outlines of Father's visitation schedule by stating that "I'm thinking that he ought to have almost all the summer, probably six weeks or seven." It is undisputed that Mother arranged for Father to enjoy visitation in Tennessee with his daughter from July 10 to August 23, 2009. Indeed, Father acknowledged twice during his testimony that he had seven weeks of visitation that summer. He argues, however, that Mother violated the court's order by not allowing him any visitation in June.

It is clear from the language used that Mother did not violate the trial court's ruling that was issued orally in February. The written order derived from the court's ruling was entered *nunc pro tunc*[5] on August 25, 2009. It declared only that Father would have visitation "during summer vacation." Father argues that "during summer vacation" means the entire summer vacation, including the month of June. For the purposes of this appeal, Mother does not dispute that "during summer visitation" means the entire summer, although we think Father's definition is not supported by the language.

Since the court declared on February 10, 2009, that Father would be granted summer visitation of six or seven weeks, any subsequent order that purported to grant him more visitation for the entire summer could not be validly enforced *nunc pro tunc* as of the earlier date, even if the words "during summer vacation" were interpreted as meaning some time during each month in that time period. Thus, by allowing Father to enjoy summer visitation

---

[5]*Nunc pro tunc* is a Latin term that means "now for then." It can be applied by a trial court in appropriate situations to give the court's judgment retroactive effect. "Where a judgment was pronounced but not entered, it may later be entered *nunc pro tunc* as of the date of its pronouncement, provided that the requisite facts appear of record to justify its entry." *Spence v. Helton,* M2005-02527-COA-R3-CV, 2007 WL 1202407 at *6 (Tenn. Ct. App. Apr. 23, 2007) (no Tenn. R. App. P. 11 application filed). "An entry of a judgment *nunc pro tunc* should only be granted when it can be shown by clear and convincing evidence that the judgment sought is the one previously announced." *Blackburn v. Blackburn,* 270 S.W.3d 42, 50 (Tenn. 2008).

for seven weeks, Mother complied with the only order she was obligated to follow before August 25, 2009.

Conversely, Father admitted that he intentionally violated a provision articulated both in the court's ruling of February 10, 2009, and in the order based on that ruling by refusing to pay one-half of his daughter's airfare. The trial court did not even address Father's violation in its final order of October 20, 2009.

As for the Labor Day weekend, the testimony of both parents indicates that although Father did not manage to exercise any visitation during that weekend, that result was due, at least in part, to failures of communication between the parties and to Father's own actions. Judging from Father's testimony about the e-mail he received from Becka, it appears that she was eager to see him again, but not as insistent as he was that visitation take up the entire weekend. After Father tried, and failed, to get the sheriff to enforce the entire visitation order, it is unclear why he did not make an effort to at least try to see his daughter, since he was in the area already. It appears that Becka was greatly disappointed that she missed his visit entirely and that Father might have been able to avoid that result by communicating directly with Mother.

The parties' dispute over the Columbus Day weekend further underlines the importance of clear communication and genuine cooperation in matters of visitation, especially when the parties are geographically apart. In the age of air travel, the 900 mile distance between Tennessee and New York is not as far as it would have been one hundred years earlier, but both parties live in small towns, distant from major airports. Any workable visitation arrangement in this case must therefore take into account the travel time between those towns and the airports closest to them, as well as their work obligations.

One complication that made the Columbus Day weekend visitation in New York especially difficult for the parties was that Mother's presence in the Tennessee court was required on the day after Columbus Day. For this and other reasons, Father's proposed three day weekend plan was impossible to accomplish, or at the very least, fraught with difficulty. Even though Mother had to appear in the very court where the question of visitation was at issue, the trial court ignored that circumstance and found Mother guilty of another "big bad violation."

Mother left Tennessee on May 30, 2009. Over the next few months, she had to establish a new home in New York for herself and her two children, enroll the children in a new school, secure a new job, and begin working at that job. Despite the obvious pressures of Mother's situation, Father demanded that she allow him to exercise his three day weekend visitation rights on the Labor Day weekend, only two weeks after Becka returned to New

-12-

York from a seven-week visitation with Father in Tennessee.

Becka, however, apparently wanted to participate in a family camping trip for part of that weekend. Father then insisted on a full Columbus Day weekend of visitation with Becka in New York, even though Mother had to be in Tennessee for court the day following the holiday. Under the circumstances, it was foreseeable that Mother would be unable to allow Father all the visitation he demanded.

In sum, we conclude that the evidence preponderates against the findings of the trial court that Mother willfully violated the visitation provisions of the existing order and, consequently, hold that there was no material change of circumstances to allow a change of custody. Since the missed visitations can be attributed to the actions of Father as much, or more so, as those of Mother, Father has not met his burden of establishing that there has been a material change of circumstances. *See Hyde v. Bradley*, 2010 WL 4024905, at *6. Accordingly, we reverse the trial court's judgment of August 25, 2009.

This reversal revives the custody and visitation order that was in effect prior to August 25, 2009, *i.e.*, the order adopted after approval of Mother's relocation. However, since Becka is in the middle of a school year, presumably in Tennessee, we remand this matter to the trial court to fashion a transition plan that will best serve Becka's needs, including an opportunity for Mother to again get her enrolled in a school in New York and acclimated there. Because Father will have had custody of Becka from August of 2009, the trial court should consider adjusting the summer vacation schedule for the upcoming summer to allow Mother a substantial amount of time with the child at her residence in New York.

## IV. ATTORNEY FEES

Mother has also asked this court to award her the attorney fees she incurred in defending against Father's petition for contempt and for change of custody, including the attorney fees for this appeal. Tenn. Code Ann. § 36-5-103(c) gives courts the discretion to award attorney fees to the prevailing party, ". . . in regard to any suit or action concerning the adjudication of custody or the change of custody of any child, or children of the parties . . ." We do not consider this an appropriate case for an award of such fees, and, accordingly, direct that each party shall be responsible for his or her own attorney fees in both the trial and appellate courts.

## V.

The order of the trial court is reversed. We remand this case to the Juvenile Court of Humphreys County for further proceedings, including the crafting of a transitional parenting arrangement to ensure a smooth transition to the custody and visitation order that was in effect before the order that we reverse. The costs on appeal are taxed to the appellee, Russell Klein.

_____

PATRICIA J. COTTRELL, JUDGE