IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 13, 2012 Session

## ROBERT W. PORTER v. BRANDI PORTER (KIMBRELL)

**Direct Appeal from the Circuit Court for Franklin County**
**No. 13435-CV      J. Curtis Smith, Judge**

**No. M2012-00148-COA-R3-CV - Filed January 25, 2013**

Upon the parties' divorce, Mother was named the children's primary residential parent. Years later, Mother petitioned to increase Father's child support, and Father filed a counter-complaint seeking to be named the primary residential parent. The trial court found that a material change in circumstances had occurred since the entry of the parties' parenting plan. The trial court further found that certain best interest factors weighed in favor of, and against, both parties; however, it determined that the children's best interests would be served by Mother remaining the primary residential parent. Father appeals and, discerning no error, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., joined and HOLLY M. KIRBY, J., concurred separately.

Robert L. Huskey, Manchester, Tennessee, for the appellant, Robert W. Porter

Timothy S. Priest, Winchester, Tennessee, for the appellee, Brandi Porter (Kimbrell)

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

Robert W. Porter ("Father") and Brandy Porter (Kimbrell) ("Mother") married on July 22, 2000.  Father filed for divorce in October 2002 and the divorce was finalized in October 2003.

The parties have two minor children: a daughter, Leah, born June 7, 2001 and a son, Trenton, born April 22, 2003.  The final decree of divorce incorporated a marital dissolution agreement and a permanent parenting plan.  The parenting plan provided that prior to the children's enrollment in school, they would reside primarily with Mother, with Father having visitation from 9:00 a.m. Friday to 5:00 p.m. Sunday each weekend with the exception of the second and fifth weekends of each month.  The parenting plan stated that upon enrollment in school, the children would continue to reside primarily with Mother, with Father's visitation to be decided at that time.  The parenting plan further provided for the children's visitation with Father for two non-consecutive weeks during the summer and for Father to pay child support by wage assignment.[1]

On January 21, 2010, the State of Tennessee, on behalf of Mother, filed a petition to increase Father's child support obligation.[2]  In response, Father filed a counter-complaint, claiming that Mother's lifestyle had declined since the divorce–she was providing an unstable and irregular lifestyle, as well as an unstable home and relationships–and  seeking to be named the primary residential parent.  The child support issue was temporarily resolved pursuant to a May 11, 2010 order which increased Father's child support obligation to $877.00 per month.

Mother then retained private counsel and filed an answer to Father's counter-complaint, on July 1, 2010, denying the allegations set forth therein, but asking the court to "establish a day-to-day schedule for the parties to exercise parenting time with the children now that they are enrolled in school[,]" and seeking additional Christmas holiday parenting time.

On July 27, 2010, Father filed a "Complaint for Contempt" alleging that since he had

---

[1]The amount of his support is not listed on the permanent parenting plan.

[2]The petition stated that Father's current obligation was $153.00 per week.

moved to be named the children's primary residential parent, Mother had interfered with his visitation on several occasions. Father later amended his complaint to allege *criminal* contempt against Mother.

A trial was held over two days in August and October of 2011. Thereafter, the trial court entered its "Memorandum Opinion and Order," on December 12, 2011, in which it found Mother in contempt for willfully failing to comply with the permanent parenting plan and it ordered her incarcerated for 24 hours, suspended upon compliance with the new parenting plan, which was subsequently entered on February 10, 2012.[3] It further found that a material change in circumstances had occurred since the entry of the parenting plan–the children's enrollment in school and the plan's failure to address an appropriate parenting schedule upon such enrollment–but that the children's best interests would be served by allowing Mother to remain their primary residential parent. The court awarded Father alternating weekend visitation from Friday at 6:00 p.m. to Sunday at 6:00 p.m., split holiday and school vacation visitation, and two weeks summer visitation. Father timely appealed to this Court.[4]

## II.  ISSUE PRESENTED

Father presents the following issue for review, as summarized:

1.      Whether the trial court erred in refusing to modify custody to name Father as the Primary Residential Parent.

For the following reasons, we affirm the decision of the trial court.

## III.  STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d) (2011)**; *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact

---

[3]This finding is not appealed.

[4]Father also filed a "Motion to Alter and Amend Parenting Plan" claiming that the February 10, 2012 parenting plan erroneously allowed Mother to claim both children for tax purposes. Father's motion was granted and the parenting plan was revised to allow Father to claim the oldest child for tax purposes until the oldest child could no longer be claimed as a dependent, and then to allow the parties to alternately claim the youngest child.

with greater convincing effect. ***Watson v. Watson****,* 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).  When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues.  ***Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC****,* 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002).  "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." ***Id.*** "[A] trial court's decision regarding custody or visitation should be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" ***Curtis v. Hill****,* 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)).  We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness.  ***Union Carbide Corp. v. Huddleston****,* 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV.  DISCUSSION

"A custody decision, once final is *res judicata* upon the facts in existence or reasonably foreseeable when the decision was made[.]" ***Scofield v. Scofield***, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 193 Tenn. 480, 246 S.W.2d 93, 95 (Tenn. 1952); *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001); *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998); *Long v. Long*, 488 S.W.2d 729, 731-32 (Tenn. Ct. App. 1972)).  However, because children's and parents' circumstances change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." ***Id.*** (citing Tenn. Code Ann. § 36-6-101(a)(1); *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995)).

Modification of an existing custody or visitation arrangement involves a two-step analysis.  ***See Boyer v. Heimermann****,* 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007).  First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred.  ***See Taylor v. McKinnie****,* No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008) (citing *Kendrick v. Shoemake,* 90 S.W.3d 566, 570 (Tenn. 2002)).  "[N]ot all changes in the circumstances of the parties and the child warrant a change in custody." ***Cosner v. Cosner****,* No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug.22, 2008).  "There are no hard and fast rules for when there has been a change of circumstances

sufficient to justify a change in custody." ***Id.*** (citing *Cranston v. Combs,* 106 S.W.3d 641, 644 (Tenn. 2003)). The decision turns on the facts of each case. ***Scofield****,* 2007 WL 624351, at *4. However, to determine whether a material change in circumstance has occurred, the court should consider whether: "(1) the change occurred after the entry of the order sought to be modified; (2) the changed circumstances were not reasonably anticipated when the underlying decree was entered, and (3) the change is one that affects the child's well-being in a meaningful way." ***Cosner****,* 2008 WL 3892024, at *4 (citing *Cranston,* 106 S.W.3d at 644; *Kendrick,* 90 S.W.3d at 570; *Blair v. Badenhope,* 77 S.W.3d 137 (Tenn. 2002)). "The presence of the word 'material' indicates that the change must be significant." ***Patterson v.*** ***Patterson****,* No. W1999-01544-COA-R3-CV, 2000 WL 33774558, at *3 (citing Black's Law Dictionary 991 (7th ed.1999)). "If the person seeking the change of custody cannot demonstrate that the child's circumstances have changed in some material way, the trial court should not re-examine the comparative fitness of the parents, *Caudill v. Foley,* 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999), or engage in a 'best interests of the child' analysis. Rather, in the absence of proof of a material change in the child's circumstances, the trial court should simply decline to change custody." ***Oliver v. Oliver****,* No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *3 (Tenn. Ct. App. Apr.26, 2004) (citing *Hoalcraft v. Smithson,* 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999)). However, if a material change in circumstances is demonstrated, the court must then consider whether a modification of custody is in the child's best interest. ***See Cranston***, 106 S.W.3d at 644.

As stated above, in its Memorandum Opinion and Order the trial court found that a material change in circumstances had occurred since the entry of the parenting plan in 2003 because the plan failed to address an appropriate parenting schedule upon the children's enrollment in school. In their respective briefs to this Court, both Mother and Father concede that a material change has occurred, and we agree. The 2003 parenting plan did not attempt to establish a visitation schedule upon the children's enrollment in school; instead, it clearly stated that the issue would be revisited at that time.

Having found a material change in circumstances has occurred since the entry of the parenting plan, we must now consider whether a change in the designation of the primary residential parent from Mother to Father is in the child's best interest, utilizing the relevant factors.[5] Tennessee Code Annotated section 36-6-404(b) sets forth the following factors to

_____

[5]"[A]fter finding that a material change in circumstances has occurred, the trial court must determine whether modification of custody is in the child's best interests using the factors enumerated in Tennessee Code Annotated section 36-6-106." ***Cranston***, 106 S.W.3d at 644. In this case, the trial court applied the factors set forth in Tennessee Code Annotated section 36-6-404 rather than in section 36-6-106. However, "[t]here is little substantive difference between the factors applicable to parenting plans, set out in Tenn. Code Ann. § 36-6-404(b), and those applicable to custody determinations, set out in Tenn. Code Ann. § 36-6-

(continued...)

consider:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

---

[5](...continued)
106(a) as far as determining comparative fitness and the best interests of the child." **Dobbs v. Dobbs**, No. M2011-01523-COA-R3-CV, 2012 WL 3201938, at *1 n.1 (Tenn. Ct. App. Aug. 7, 2012) (citing *Dillard v. Dillard*, No. M2007-00215-COA-R3-CV, 2008 WL 2229523, at *10 (Tenn. Ct. App. May 29, 2008)). In this case, as in most cases, the factors applied–those in section 36-6-106 or in section 36-6-104–would not change the analysis or the result. *See Thompson v. Thompson*, No. M2011-02438-COA-R3-CV, 2012 WL 5266319, at *6 (Tenn. Ct. App. Oct. 24, 2012). Thus, to avoid confusion, we will consider the set of factors applied by the trial court. *See id.*

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

In its Memorandum Opinion and Order, the trial court stated that it had deemed relevant, and therefore considered, five of the sixteen above-listed factors. Specifically, the trial court found that Mother had assumed greater parenting responsibilities and that Father's contributions to daily parenting responsibilities had been "minimal." It further found that Mother had set a poor example in her relationships with men and that those "relationships [had] caused instability in the children's li[ves] by constantly changing residences." However, it found that "[o]ther than this very significant fault[,] Mother has been a good mother to her child in other aspects of parenting."

Regarding Father, the trial court noted testimony that Father and his mother had discussed the parties' divorce with the children and it found that this discussion was "inappropriate and designed to damage the children's relationship with their mother." It found that even though the discussion was prompted by the children's questions, that Father and his mother should have refused to disclose details of the divorce to the children. As a result of this discussion, the trial court concluded that "Father and his family are not encouraging a close and continuing relationship between the children and their Mother and would not do so in the future," and it caused the court to question Father's emotional fitness

to parent the children. Finally, the court found significant that Father had known for "years" of Mother's allegedly inappropriate relationships with men, but that he sought a custody modification only *after* Mother sought an increase in child support.

After finding certain factors weighed in favor of, and against, both parties, the trial court ultimately concluded that Mother should remain the children's primary residential parent. "Because '[a] determination of a child's best interests must turn on the particular facts of each case[,]' we must review the trial court's findings *de novo* with a presumption of correctness." ***Anthony v. Rodgers***, No. W2002-01240-COA-R3-CV, 2003 WL 22213208, at *4 (Tenn. Ct. App. Sept. 23, 2003) (quoting *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993)).

On appeal, Father argues that the trial court "found all the things necessary to warrant a change of Primary Residential Parent"–including instability of Mother and stability of Father–but that it "was so upset with the father for discussing the divorce . . . with the children, even though that conversation and discussion was prompted by the actions of the mother, [that] the trial court regrettably let that override the best interest of the children[.]" Mother, however, points out that Father has taken issue only with her unmarried cohabitation and that he has not otherwise questioned her ability to parent. She contends that neither the divorce decree nor the permanent parenting plan prohibited her from cohabitating with a paramour in the children's presence and that no evidence was presented that these relationships affected the children's welfare.

At trial, Mother testified that after the parties' separation in September of 2002, she and the children moved in with her mother in Tullahoma, in Coffee County. In 2005, Leah began attending pre-kindergarten at Hickerson Elementary School in Coffee County. However, Mother claims that she was forced to remove Leah from the program after Father "pitched a fit" because it interfered with his Friday visitation.

Mother began dating Bradley Guinn "right after Trenton was born[,]" in April 2003. She and Mr. Guinn dated from 2003 until they married in September 2007. They did not, however, cohabitate in his Manchester, Coffee County, home until they married. Mother and Mr. Guinn separated in October 2008, and Mother ultimately admitted, on cross examination, that in October 2008, she and the children moved in with Mother's next boyfriend, Kevin Bryant, at his Tullahoma home.[6] Mother's divorce from Mr. Guinn was not finalized until

---

[6]In her "Responses to Counter-Plaintiff's First Set of Interrogatories," Mother stated that she moved in with Mr. Bryant in January 2009 and in her direct testimony she stated that she moved in with Mr. Bryant "right around Christmas" of 2008.

June 2009.[7]  At some point, Mother and Mr. Bryant became engaged, but they never married. Mother and Mr. Bryant "were together on and off" from 2008 until September 2010.[8] According to Mother they broke up "[p]robably four" times during their two year relationship and each breakup typically lasted "from one to two to three days."  During these brief breakups, Mother and the children stayed with Mother's mother.  Mother and Mr. Bryant ultimately ended their relationship in September 2010.  Mother and the children moved out of Mr. Bryant's home and back in with Mother's mother.

According to Mother, "maybe two or three weeks" after her relationship with Mr. Bryant ended, Mother began a relationship with Carey Baldwin, her husband at the time of trial.  Mother and Mr. Baldwin became engaged in December 2010 and they married on July 9, 2011.  From September 2010 until "the end of April, first of May" 2011, Mother and the children resided with Mother's mother.  Mother testified that she and Mr. Baldwin had decided not to cohabitate until they were married, but that circumstances in Mother's mother's home had caused Mother and the children to move into Mr. Baldwin's home "at the end of April, first of May" 2011.  Mother explained that her ill, elderly grandmother had returned to Mother's mother's home and that the house was cluttered and with "nurses coming in and out all hours of the day . . . everybody got woke up [sic]."

Mother testified that she has never exposed the children to anything she believed was inappropriate.  In her opinion, it is not inappropriate to cohabitate out of wedlock in the presence of children "[i]f you plan to be married[.]"

Mother has been employed by Family Practice of Tullahoma, since January of 2008, working primarily for Dr. Patsimas.  Mr. Baldwin has been employed by the Coffee County Sheriff's Department for over eleven years, and he has two adult children.  Only Mr. Baldwin, Mother, Leah and Trenton share Mr. Baldwin's 2300 square foot, three bedroom home.  According to Mother, the children "get along great" with Mr. Baldwin, and Father conceded that he has no problem with the children staying in Mr. Baldwin's home now that Mother and Mr. Baldwin have married.

During Mother's moves, the children were enrolled in two different schools: Hickerson Elementary School in Coffee County and Lynchburg Elementary School in Moore

---

[7]Mother attempted to explain her living with Mr. Bryant prior to the finalization of her divorce from Mr. Guinn, by noting that the parties' attorney became seriously ill and by stating that "we had already basically signed all the papers and we were just kind of waiting on him to come back."

[8]According to Mother's "Responses to Counter-Plaintiff's First Set of Interrogatories," Mother and the children moved with Mr. Bryant from Tullahoma to Winchester and then back to Tullahoma.

County. It appears that Leah was enrolled at Hickerson Elementary from kindergarten through half of third grade. Due to Mother's relationship with Mr. Bryant, Leah was enrolled at Lynchburg Elementary for the second half of third grade, in December 2009, through the first half of fourth grade, in December 2010. However, after Mother's relationship with Mr. Bryant ended, Leah re-enrolled at Hickerson Elementary for the second semester of fourth grade and at the time of trial, she was still enrolled there.[9]

Trenton was enrolled at Hickerson Elementary from kindergarten through half of first grade. Along with his sister, he then enrolled at Lynchburg Elementary for one year. He returned to Hickerson Elementary half-way through second grade where, presumably, at the time of trial he was still enrolled. Thus, with the exception of a one-year period, both children have apparently been enrolled at Hickerson Elementary School.[10] It was undisputed at trial that both children do well in school and absences are not an issue.

At trial, Father testified that following his divorce from Mother, he moved into his parents' home in Manchester where he lived until he married his current wife, Tanya, on August 4, 2007. After Father and Tanya married, they moved to a home in Tullahoma, also in Coffee County. At some point, Father and Tanya moved to Lynchburg where they resided at the time of trial. Father testified that the children never saw him spend the night with a woman–other than his mother–until Father and Tanya married. In fact, Tanya testified that she and Father never spent the night together prior to their marriage.

Father has been employed as an electrician at Arnold Air Force Base in Manchester for three years, and he earned approximately $66,000 in 2010. Father has a three bedroom home; Leah has her own bedroom and Trenton shares a bedroom with Father and Tanya's twenty-month-old son, Taylor. According to Father, Leah and Trenton have a good relationship with both their step-mother, Tanya, and their half-brother, Taylor.

Father expressed his belief that setting an appropriate example for the children is "very important[] [b]ecause they not only hear what you say, but they watch what you do." He stated that although he did not seek advice from an attorney until February 2010, he had been "noting the comings and goings of" of Mother since July of 2008. He denied filing his counter-complaint for custody in response to Mother's petition for increased child support.

_____

[9] Although Mother and Mr. Bryant broke up in September 2010, the children did not re-enroll in Hickerson Elementary until December 2010 because Mother transported them to their then-current school, Lynchburg Elementary, from September 2010 until that time.

[10] From the children's school records, it is unclear in which school the children were enrolled for a brief period from February 6, 2009 until March 16 or 17, 2009.

He claimed that since filing his counter-complaint, Mother had become uncooperative and she had interfered with his visitation on several occasions. According to Father, when he attempted to assert his visitation rights, Mother responded that the parenting plan became invalid once the children enrolled in school.

At trial, Mother testified extensively regarding her parental involvement, and she claimed that Father's involvement was limited. Although Father was entitled to two weeks of summer visitation, Mother claimed that Father did not exercise more than one week until 2010. She stated that she enrolls the children in school and she attends all awards ceremonies and parent/teacher conferences. In contrast, she stated that Father came *only* to Trenton's kindergarten graduation and that she has never seen him at a parent/teacher conference. Father admitted that he had completed no paperwork to enroll the children in school and that he had attended no parent/teacher conferences, although he based this failure upon his working second shift "[u]p until about a year ago." When questioned, Father was unable to name either child's upcoming, current, or past teachers. Contrary to Mother's testimony, Father claimed that he had attended the children's end-of-school-year and end-of-ball-season awards ceremonies. He stated that he had seen "a few" of Leah's report cards and that Leah's school had denied his requests for further grade reports. Father admitted that he had never taken the children to the doctor, and he "assume[d]" that their current pediatrician was Dr. Patsimas, Mother's employer. He claimed that during the summer, he took to the children to the optometrist, but Mother disputed this claim and she submitted medical records which she claimed proved that she had taken both children to see an optometrist in the summer of 2008 and that she had taken Leah again in the summer of 2009.[11]

Both children are very involved in sports. Mother stated that she encourages and facilitates, but does not force, their participation. She testified that she transported the children to games and practices, purchased their sports equipment, and supplied their sign-up fees. Mother was able to name Leah's softball coaches, and Mother stated that she had coached Leah's cheerleading squad. However, she claimed that Father only attended games "on his weekends" and he caused the children to miss games or practices because after assuring Mother he and the children would attend, he simply failed to show up. Mother maintained that Father offered no explanation for the absences, and that when Mother offered to retrieve the children he stated, "it's none of your business what happens at my house. We're not coming." Mother cited one specific example when Father failed to transport Leah to a softball game in Jasper. Father testified that the absence was due in part to his illness, but Mother stated that Father gave her no such explanation, and that he simply turned off his phone after Mother offered to retrieve Leah for the game. She testified that Father had

---

[11]The medical records do not state which guardian presented the children for treatment, but Mother identified the children's names as being written by her.

picked up the children the previous evening, and that he exhibited no signs of illness. Father admitted that he chose not to respond to Mother's text messages regarding the missed ballgame.

Father testified that he attended "about all" of Leah's ballgames and that he attended at least some of Trenton's football practices and games. He could not name the children's prior coaches, but he was able to name their current coaches, and he testified that he had served as an assistant coach for Trenton's summer 2011 team. The oldest child, Leah, then-ten-years-old, testified that Mother transports the children to and from practices and ballgames during the weeks, but that Father did so if it was their weekend to be with him.

Mother testified that Father is unreceptive to her attempts to discuss the children. She stated, "If I call [Father] with any concerns or anything like as if one of the kids has said something or if they're upset when they come home, I will call him and try to discuss it with him, and the first thing out of his mouth is always what happens at my house is none of your business. I try to talk to him about sending the kids to the pond by themselves, he told me what happens at his house is none of my business and then second thing he says automatically is stop harassing me and hangs up." She also testified that Father impedes her access to the children when they are in his home although she always allows the children to talk to Father when he calls and if they miss a call "they call him back within five or six minutes."

The oldest child, Leah, corroborated Mother's testimony. She stated that Mother allows the children to return Father's phone calls, and that she only talks to Mother while at Father's home "[i]f he lets us answer the call." According to Leah, Father "says on Saturdays [Mother is] not allowed to call since it's not in the papers." She further stated that if the children failed to bring their cell phone chargers, he makes them "cut them off and put [them] in his room for the weekend, and [the children] don't get to talk to mom." In the three months prior to Leah's testimony, Father had twice confiscated the phones.

Mother's former boyfriend, Kevin Bryant, testified as a witness for Father. He acknowledged that Mother was still married to Mr. Guinn when she moved in with him. He claimed that he and Mother broke up "between five and seven times"[12] during their relationship, and that the relationship ultimately ended because of Mother's infidelity. Mother denied this accusation. Mr. Guinn, however, stated that the children are Mother's primary focus and that they love her and have a very strong bond with her.

As stated above, the trial of this matter was held over two days in August and October

---

[12]Mother testified that the couple broke up "[p]robably four" times.

of 2011. Between the trial dates, a discussion of the parties' divorce took place between the children, Father and Father's parents. Leah stated that the children, Mother, and step-father Mr. Baldwin were shopping in Wal-Mart when Mr. Baldwin's co-worker, Kelly, appeared and "mom turned around and said, look, Trenton, there's your daddy[,]" in reference to Kelly. Trenton was confused, and Mother said "something like," "he would have taken you in if dad didn't want you." Mother then apparently stated to Trenton that a DNA test had been performed to establish Father's paternity.

According to step-mother Tanya, eight-year-old Trenton, while at Mother's home, called Father crying after learning of the paternity test. When the children were at Father's home, Leah "brought up something[,]" although she could not recall what, which caused the children, Father and Father's parents to sit down and which caused Father's mother to "come back with a stack of notes from all the way [back to] when [Leah] was born." Leah did not recall Trenton calling Father and asking about the paternity test, but she acknowledged that the conversation at Father's home occurred in response to the children's questions. Leah explained the discussion as follows:

> A     [Father's mother] started reading some notes in there, and it was too much for me and I started crying.
>
> Q     Did you ask her to stop?
>
> A     Yes. I said, please stop, please stop, it's too much. [Father's father] started saying, you need to hush, and hush, and stop, and you need to be quiet and stuff like that. And I said I couldn't help it, and he's like, whatever. And once I stopped crying [Father's mother] kept reading and then she eventually started crying.
>
> Q     At any point did your dad try to stop your . . . grandmother?
>
> A     No. He just ran with the . . . rein.
>
>    . . . .
>
> Q     Now, sweety, I don't mean to upset you, but what were some of the things that your grandmother was telling you that you found upsetting?
>
> A     She said that . . . mom said that she would be over at [someone's] house . . . dad called over there and asked if [Mother] was over there . . . and she said, no, [Mother] is somewhere else. She hasn't been at my house tonight. Dad hung up and obviously got mad and then he called [his parents] . . . well he found out that mom was cheating on him.
>
>    . . . .
>
> Q     What was the thing about Trenton?
>
> A     When Trenton was born, . . . they supposedly said mom wouldn't let dad see him until he was seven months old. [Father's mother] said when I was being dropped off mom would cover Trenton's face up to

where dad couldn't see him[.]

. . . .

Q    At any point has your [Father's mother] . . . brought up the issue of
     Trenton's father?

A    Yes, sir.

Q    When was that?

A    When we had the discussion where everybody was sitting in the den.

Q    What happened during that conversation?

A    We were talking about that and then [Father's mother] brought up
     Trenton and the test thing and then that's when I started crying and said
     stop, stop, it's too much.

Q    Was Trenton present during that?

A    Yes, sir.

When asked whether divulging such information to young children was appropriate, step-
mother Tanya answered, "I mean, they need to know what happened. If one of them is going
to say something, then they both need to let the kids know what happened."

Ten-year-old Leah was then asked about her custodial preferences. She stated that she
would like to have Father's weekend visitation reduced to alternating weekends–as opposed
to three weekends per month–because school limits her ability to spend time with Mother
during the week. She stated that she wishes to live with Mother because "[s]he's the one
who lets us do all the sports. . . . Dad is too busy with [his young son,] Taylor. So we really
don't have much time with dad unless we go to [Father's mother's] house." Leah would not
object to Father's weekends beginning on Thursday and she agreed that "flip-flopp[ing] it"
where she stayed with Father during the week and spent three weekends per month with
Mother would be better "[i]n a way[,]" although that would not be her preference.

As stated above, the trial court found Mother had assumed greater parenting
responsibilities than had Father and that other than having set a poor example in her
relationships with men and causing the family to frequently move residences, she had
parented properly. The trial court further found that Father's family's discussion of the
divorce circumstances was designed to damage the children's relationship with Mother and
it caused the court to question Father's ability to parent. Finally, it found significant that
Father had not instituted the custody proceedings until *after* Mother petitioned to increase
child support. Ultimately, it allowed Mother to remain the children's primary residential
parent.

On appeal, Father argues that the trial court placed too much emphasis on Father's
family's discussion with the children and that it overlooked that the discussion was prompted

-14-

by Mother's conduct at Wal-Mart. He also identifies nine instances in which Mother allegedly provided false testimony. We begin our best interests analysis by considering the alleged perjured testimony.

At trial, Mother testified that, pursuant to a court order, Mr. Bryant's sixteen-year-old neice was prohibited from coming near Mr. Bryant's children because of allegedly inappropriate conduct that had occurred between then-three-year-olds approximately thirteen years prior. Mother testified that after learning of this restriction around "Christmas of '09, [or] the first of 2010[,]" the niece no longer babysat Leah or Trenton. However, on cross examination, she admitted that she had used the niece as a babysitter during the two months after she learned of the restriction.

As set forth in a footnote above, in her "Responses to Counter-Plaintiff's First Set of Interrogatories," Mother stated that she moved in with Mr. Bryant in January 2009 and in her direct testimony she stated that she moved in with Mr. Bryant "right around Christmas" of 2008; however, on cross examination, she ultimately admitted that she had moved in with Mr. Bryant in October 2008.

Next, during discovery, Mother was asked "During the time period since the referenced divorce have you had any man or any men spend the night with you in the same residence with your children while you were married to another individual?" Mother answered "No." At trial, Mother stated that she had answered negatively because she understood the question to ask whether another man had *lived with her* in her residence, and she insisted that *she had lived* with Mr. Bryant in his residence.

Next, Father points out that on direct, Mother testified that her relationship with Mr. Guinn was "[n]ever a problem," but on cross, she admitted that *during their marriage,* she had pursued criminal charges against Mr. Guinn for alleged physical abuse. She explained that she believed the prior question related to problems occurring *since her divorce* from Mr. Guinn.

Regarding Leah's missed softball game in Jasper due to Father's alleged illness, Mother testified that when Father retrieved Leah the evening prior, that Father exhibited no signs of illness. However, she later admitted that she could not remember whether or not it was Father who had retrieved Leah. She explained that she does not make a notation on her calendar of who retrieves the children each time, and that her testimony simply reflected that Father "never appears sick any time I ever see him."

At trial, Mother stated that she kept a record of Father's attendance at the children's sports functions per Child Support Magistrate Leech's suggestion. On cross, Father's

counsel pointed out that Mother's records began in January, but that she did not appear before Magistrate Leech until the end of April. However, Mother stated that she had simply filled in January through March based upon entries she had previously made in another calendar.

Next, Father points out that in the custody matter, Mother took the position that the permanency plan became invalid once the children enrolled in school, but that she did not assert this position before Magistrate Leech.

Father also claims that in her direct testimony Mother blamed her break-up from Mr. Bryant upon his health problems, but that on cross examination she acknowledged that Mr. Bryant had accused her of infidelity. However, on cross examination Mother *denied* any infidelity, and moreover, in her direct testimony Mother stated only that Mr. Bryant's health was an "issue that developed between [Mother] and Mr. Bryant[;]" she did not blame the couple's break up, in part or in whole, on Mr. Bryant's health.

Finally, Father claims that after Mother testified that she moved in prematurely with Mr. Baldwin due to her grandmother's illness, that she later acknowledged that the move was simply a matter of choice. Mother's testimony, however, indicated only that Mother and the children were not *forced* from Mother's mother's home, but that the uncomfortable living arrangements caused by the illness expedited the move.

The trial court found that Father "had some success" in attacking Mother's credibility at trial. However, it determined that the essential facts of the case were undisputed. We conclude that of the nine alleged "lie[s]" advanced by Mother, most can be disposed of as *not* inconsistent, a result of innocent confusion or artful interpretation, or trivial inconsistencies irrelevant to the facts in this case. Thus, we agree with the trial court's conclusion that Mother's credibility was only *somewhat* weakened. ***See Mach. Sales Co., Inc.*** 102 S.W.3d at 643.

Again, on appeal, Father primarily argues that the trial court erred in failing to name him primary residential parent after finding that Mother's "relationships have caused instability in the children's li[ve]s by constantly changing residences." According to Father, the overarching factor considered by the court was Father's family's discussions of the divorce with the children.

Having reviewed the record in this case, we conclude that the evidence does not preponderate against the trial court's factual findings that Mother has maintained primary responsibility for the children since the parties were divorced and that Father's daily contributions have been minimal. Despite Father's contrary assertions, we further conclude

that the trial court did not "overlook[] and ignor[e]" that the discussion between the children, Father and Father's parents occurred in response to the children's questions. Although we conclude that Mother was certainly at fault for prompting the discussion, we agree with the trial court's factual finding that the discussion with Father's family was "totally inappropriate and designed to damage the children's relationship with their mother[, and e]ven in light of these small children's questions the adults should have refused to supply such details." Father's unwillingness to facilitate and encourage the children's close and continuing relationship with Mother was further evidenced by Father's refusal to discuss Mother's concerns regarding the children as well as by his impeding Mother's access to the children when they are in his home. Although Mother's actions in Wal-Mart demonstrated a significant lapse in judgment and some evidence was presented that Mother interfered with Father's visitation post-modification-petition, evidence was also presented that indicates Mother, more so than Father, facilitates the children's relationship with the other parent.

"A custodial parent's non-marital sexual activities may be appropriately considered in the context of a custody decision." *Cosner*, 2008 WL 3892024, at *6 (citing *Curtis*, 215 S.W.3d at 841; *Earls v. Earls*, 42 S.W.3d 877, 890 (Tenn. Ct. App. 2000)). "'Cohabitation alone does not necessarily provide grounds for changing custody when there is no proof that it has or will adversely affect the children.'" *Id.* (quoting *Curtis*, 215 S.W.3d at 841). "A parent's sexual conduct, if practiced inappropriately or indiscriminately, can adversely affect a child's well-being, and in those cases, such conduct can be an important factor in custody determinations." *Id.* (citing *Berry v. Berry*, No. E2004-01832-COA-R3-CV, 2005 WL 1277847, at *5 (Tenn. Ct. App. May 31, 2005)). "'[S]exual indiscretion does not, by itself, disqualify a parent from being awarded custody, but it may be a relevant factor if it involves the neglect of the child.'" *Id.* (citing *Lockmiller v. Lockmiller*, No. E2002-02586-COA-R3-CV, 2003 WL 23094418, at *5 (Tenn. Ct. App. Dec. 30, 2004)). Moreover, "a trial court should not fashion a custody decision as punishment of a party for human frailties, past missteps, or perceived moral shortcomings in the absence of demonstrated adverse consequence to the children." *Id.* (citing *Curtis*, 215 S.W.3d at 840; *Kesterson v. Varner*, 172 S.W.3d 556, 561 (Tenn. Ct. App. 2005); *Earls*, 42 S.W.3d at 885; *Oliver v. Oliver*, No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *2 (Tenn. Ct. App. Apr. 26, 2004)).

In this case, the evidence demonstrated that following the parties' separation, Mother and the children lived with Mother's mother from September of 2002 until September of 2007, when they moved in with Mother's husband, Bradley Guinn. Mother and the children lived with Mr. Guinn from September 2007 to October 2008, when they moved in with Mother's boyfriend, Kevin Bryant–who at some point became her fiance–while Mother was still married to Mr. Guinn. From September 2008 to September 2010, Mother and the children resided with Mr. Bryant with the exception of a handful of "one to three day" stays with Mother's mother during breaks in the relationship. From September 2010 to

approximately April 2011, Mother and the children returned to Mother's mother's home. Then, in April 2011, Mother and the children moved in with Carey Baldwin, whom Mother wed in July 2011. During the course of these moves, the children transferred out of their initial school system for a one-year period before returning.

The trial court found that Mother had set a poor example for her children in her relationship with men and that the relationships had caused instability in the children's lives by forcing them to "constantly chang[e] residences." However, despite this "very significant fault[,]" it found that Mother had parented appropriately.

We find that the evidence does not preponderate against the trial court's finding that Mother's relationships adversely affected the children by necessitating moves among the residences of the three men and Mother's mother. However, beyond "perceived moral shortcomings[,]" *see Cosner*, 2008 WL 3892024, at *6 (citations omitted) (Tenn. Ct. App. Aug. 22, 2008), we find no "*demonstrated* adverse consequence to the children[,]" *see id.* (citations omitted) (emphasis added), to support the trial court's determination that Mother set a "poor example . . . for her children in her relationship with men[.]"[13]

Finally, the trial court found significant that Father had known for "years" of Mother's allegedly inappropriate relationships with men, but that he sought a custody modification only *after* Mother sought an increase in child support. The trial court "moderately weigh[ed] this factor in Mother's favor." We conclude that although Father's delayed filing could demonstrate a lack of sincerity on his part, a trial court, in making a custody determination, can and should consider *all* circumstances relevant to the children's best interest, regardless of whether those circumstances knowingly persisted prior to the modification petition. As such, under a best interests analysis, we decline to hold any delay against Father.

In conclusion, we find that Mother acted inappropriately in prompting the children's questions regarding the parties' divorce and that Father, likewise, demonstrated a significant lack of parental discernment when he allowed such an upsetting discussion to persist. Although both parties are at fault for the inappropriate discussion-related conduct, the evidence demonstrated that Mother primarily cares for the children and she promotes their relationship with Father, while the contrary is not true of Father. Mother's relationships with men caused the children to relocate residences and to change school systems for a one-year period, but Mother otherwise demonstrated her ability to parent appropriately and a close

___

[13]We note that in Father's attempt to impeach Mother's credibility, Mother acknowledged that, during her marriage to Mr. Guinn, she had pursued criminal charges against him for alleged physical abuse. However, the circumstances of the charges were not expounded upon, and we find no indication that the trial court based its "poor example" finding upon this event.

emotional bond between Mother and the children was made evident. Based upon the foregoing, we find no error in the trial court's conclusion that it is in the children's best interest for Mother to remain the primary residential parent. The decision of the trial court is affirmed.

#### IV. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to Appellant, Robert W. Porter, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.