IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 16, 2013 Session

## ROBERT TREY WOOD, III v. JENNIFER ROSE WOOD

**Direct Appeal from the Chancery Court for Obion County**
**No. 28,898      W. Michael Maloan, Chancellor**

---

**No. W2012-01250-COA-R3-CV - Filed May 16, 2013**

---

Mother appeals the trial court's order naming Father primary residential parent and setting child support. Discerning no error, we affirm and remand.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and DAVID R. FARMER, J., joined.

David W. Camp, Jackson, Tennessee, for the appellant, Jennifer Rose Wood.

Steve Conley, Union City, Tennessee, for the appellee, Robert Trey Wood, III.

**OPINION**

**I. Background**

The parties, Appellee Robert Trey Wood, III ("Father") and Appellant Jennifer Rose Wood ("Mother") were married in 2007 and a child was born to them the same year. The parties separated in the fall of 2010, with Mother taking the child from the parties' home in Union City, Tennessee and moving to Jackson, Tennessee. As a result of the separation, Mother initially denied Father visitation with the child. Father filed for divorce on November 12, 2010. On the same day, Father filed a motion to designate a temporary residential parent for the minor child. On November 17, 2010, Mother filed a response to the motion, seeking to be named the primary residential parent. Mother later filed a response and counter-complaint to Father's divorce complaint. The parties eventually entered into a consent order in which Mother was temporarily named the primary residential parent and Father was awarded reasonable visitation. After Mother was named primary residential parent, she

enrolled the child in a college preparatory private school at her own expense.

The divorce and child custody issues were eventually heard on January 24 and 25, 2012. Both Mother and Father blamed the demise of the marriage on the other's drinking problem. Mother testified that Father drank approximately five nights a week. According to Mother, Father would often become drunk and angry toward her in the presence of the child. Several witnesses testified to volatile verbal exchanges they had witnessed between the parties during the course of the marriage. According to the witnesses, these arguments sometimes escalated nearly to the point of physical violence. In addition, several witnesses testified to the sometimes excessive alcohol consumption on the part of both parties. Father admitted that he had been arrested several times prior to and during the marriage for drinking-related offenses. Specifically, Father pled guilty to driving while under the influence prior to the marriage and boating while under the influence during the marriage; however, Father and his parents maintained that Father was not impaired at the time he was arrested for the boating charge. Father was also arrested twice for domestic violence against Mother. In one incident, Mother testified that Father bit her, slapped her, and pulled her hair. Father alleged, however, that Mother was often violent toward him. Indeed, during this same incident, Father alleged that Mother threw a glass bottle at him and broke one of the interior doors of the house. Mother admitted that she may have damaged a door at the parties' home during this argument. The child was in the home sleeping during this incident. Both parties were arrested and the maternal grandmother arrived to care for the child. All domestic violence charges against both parties were eventually dismissed.

In addition to the violence and drinking issues alleged by both parties, Father blamed Mother's extramarital affair for the separation. Father admitted that he became jealous during the marriage once he began to suspect that Mother was having an affair. At trial, Mother admitted to having an extramarital affair prior to the separation. Father also entered into evidence several Facebook messages written by Mother post-separation in which Mother admitted to drinking in excess and implied that she was having sexual relations with other men. Mother, in contrast, argued that Father also had an extramarital affair. Father admitted that he began dating a woman who lived near him after the separation. Indeed, Father and the child spent considerable time with Father's girlfriend and her children. Father alleged, however, that Mother had several relationships with different men, many of whom were introduced to the child. At trial, Mother admitted that she had been sexually involved with four different men since the separation. Mother's sister testified that she met two of Mother's boyfriends at events that Mother attended with the child. Further, one prior boyfriend testified that Mother and the child often spent the night at his apartment during their six month relationship.

Both parties agreed that the child was doing well in school. The child's teacher

testified that the child was meeting requirements at the college preparatory school in Jackson. According to Mother, Father refused to pay any of the expenses for the child's private school education. Father argued that the public school system in Union City was as good or better than the expensive private school in which Mother had enrolled the child. Mother agreed that the preschool in Union City was "a good place for [the child] to be at that time." However, Mother testified that the curriculum at the private school in Jackson is more structured than the school in Union City and that, because of the way the curriculum is structured in the Union City school, she was concerned about the child's progress.

Mother testified that she works as a nurse and is at work for approximately twelve hours a day, three days a week. Prior to and around the time of the separation, Mother worked the overnight shift; therefore, Father was often required to care for the child while she was at work. However, after Mother relocated to Jackson, she took different employment that required her to work from 7:00 am to 7:00 pm in Henderson, Tennessee. By the time of trial, Mother had again changed jobs, to Baptist Memorial Hospital in Memphis. Mother's job in Memphis also requires her to work from 7:00 am to 7:00 pm, three days a week. Because she lives in Jackson, Mother is also required to make an approximately two-and-a-half hour commute each shift. Other than a sister who lives an hour away, none of her family lives near her. Consequently, Mother employs a nanny to take care of the child when she is at work and the child is not with his Father. The nanny was not called to testify.

In contrast, Father works for his parents, who provide him a rent-free home, where the parties resided throughout the marriage. Both of Father's parents testified that they were willing and able to care for the child and provide a stable family unit pursuant to the child's best interests. Father argued that because of Mother's work and school schedule, he was the primary caregiver for the child throughout the marriage. Mother, however, alleged that Father would leave the home to drink with his friends, sometimes for days at a time, and that, consequently, she was the primary caretaker of the child prior to the separation. Maternal grandmother likewise testified that she was sometimes called by Mother to look after the child while Mother was at work, even though Father was at home, because Father was still sleeping after a night of drinking. In addition, Mother argued that Father has an unhealthy reliance on family support and that, unlike Father, she is able to care for the child while being financially independent. Mother took issue with Father's parents' interference in their relationship both during the marriage and after the separation. Mother testified to one incident post-separation in which Father and his father attempted to make Mother sign a contract written by paternal grandfather regarding visitation with the child. Mother and paternal grandfather both testified that this incident escalated into a shouting match between them in the presence of the child. Father was present during the incident, but was not involved in the verbal altercation. The police were eventually called. Mother and her own mother additionally testified to another incident in which Father became angry that Mother

was allegedly late to exchange the child. Mother called the police during this incident. No arrests were ever made as a result of either of these incidents. Mother further testified as to a text message sent to her by Father in which Father stated that he was looking forward to informing the child that Mother refusing to allow Father to see the child in violation of the agreed temporary parenting plan made the child miss a "special su[rp]rise."

At trial, Mother also argued that because Father receives housing from his parents/employers, such housing should be imputed to him as income for child support purposes. However, Mother elicited no testimony from Father, or his parents, as to the reasonable rental value of the home.

At the conclusion of the testimony, the trial court took the matter under advisement. On February 8, 2012, the trial court sent the parties a letter ruling, detailing its findings on the child custody issue. The trial court acknowledged that both parents had engaged in periods of excessive drinking while married and after the separation. In addition, the trial court acknowledged that Father had pleaded guilty to alcohol related crimes. The trial court, however, found that Father's work schedule was more flexible, that his support system was better, and that his lifestyle was more stable than Mother's. Considering all of the factors, the trial court concluded that the evidence weighed in favor of naming Father primary residential parent.

On May 11, 2012, the trial court entered the final decree of divorce in this case and a permanent parenting plan in which Father was named the primary residential parent and Mother was awarded reasonable visitation. In addition, the trial court set child support without imputing income to Father for the housing he receives from his parents/employers.

Mother appeals, raising two issues:

1. Whether the trial court erred in naming Father primary residential parent of the child?
2. Whether the trial court erred in failing to impute income to Father for housing he receives from his parents/employers?

## II. Analysis

We begin with Mother's argument that the trial court erred in naming Father primary residential parent of the parties' child. Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Tenn. R. App. P. 13(d). In applying the *de novo* standard,

we are mindful that "[t]rial courts are vested with wide discretion in matters of child custody and that the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Hyde v. Amanda Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct.12, 2010) (citing *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions." *Hyde*, 2010 WL 4024905, at *3 (citing *Johnson*, 169 S.W.3d at 645). Accordingly, appellate courts review a trial court's decision regarding which parent to name as the primary residential parent for an abuse of discretion. *See Fulbright v. Fulbright*, 64 S.W.3d 359, 365 (Tenn. Ct. App. 2001) (citation omitted); *see also Porter v. Porter*, No. M2012-00148-COA-R3-CV, 2013 WL 313838, at *14 (Tenn. Ct. App. 2013) (Kirby, J., concurring) (declining to reverse the trial court's ruling only because of the "high standard" required under abuse of discretion review). "[A] trial court's decision regarding custody or visitation should be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). Thus, it is not within the province of appellate courts to tweak a parenting plan in hopes of achieving a better result than the trial court. *See Eldridge*, 42 S.W.3d at 88.

The trial court's discretion, however, is not unbounded. *Hogue*, 147 S.W.3d at 251. The court must base its decision upon proof and apply the appropriate legal principles. *Id.*. "By statute as well as case law, the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs." *Burden v. Burden*, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007) (quoting *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. Oct. 15, 2004)). "In choosing which parent to designate as the primary residential parent for the child, the court must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (citing *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. 1983)). "In engaging in this analysis, the court must consider the factors set out in Tennessee Code Annotated § 36-6-106(a)." *Ellis*, 211 S.W.3d at 286 (footnote omitted). While "there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination," the statute nevertheless "requires the trial court to consider

all the applicable factors."[1] ***Murray v. Murray***, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at \*8 (Tenn. Ct. App. Sept.28, 2010). Moreover, this Court has encouraged trial courts to "be as precise as possible in making child custody findings" in order to facilitate meaningful appellate review. ***In re Elaina M.***, No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at \*8 (Tenn. Ct. App. Oct. 25, 2011).

Accordingly, we will consider each applicable factor contained in Tennessee Code Annotated Section 36-6-106(a),[2] along with the trial court's findings and the evidence contained in the record.

>(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

The trial court found that "both parents appear to be devoted" to the child. Neither parent contests this finding and the evidence does not preponderate against it. Accordingly this factor favors neither parent.

>(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

---

[1] This Court has previously expressed concern that the case law holding that trial judges need not articulate the factors pursuant to Tennessee Code Annotated Section 36-6-106(a) appears to conflict with the intent of Tennessee Rule of Civil Procedure 52.01. *See* ***In re Elaina M.***, No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at \*8 n.13 (Tenn. Ct. App. Oct. 25, 2011).

[2] The trial court in this case expressly relied on the factors contained in Tennessee Code Annotated Section 36-6-106(a). There are currently two different statutes setting out non-exclusive lists of factors for the trial court to apply when designating a primary residential parent and adopting a parenting plan consistent with the child's best interest. Tennessee Code Annotated § 36-6-106 sets forth factors for courts to consider in divorce cases or any other proceeding that requires it "to make a custody determination regarding a minor child." Tennessee Code Annotated § 36-6-404(b) sets forth factors that a trial court is to consider when determining the designation of a primary residential parent and the division of residential parenting time. *See* ***Bryant v. Bryant***, No. M2007-02386-COA-R3-CV, 2008 WL 4254364, at \*5–6 (Tenn. Ct. App. Sept. 16, 2008). The list of factors in Tennessee Code Annotated Section 36-6-404(b) for the court to consider in determining a parenting plan are substantially similar to the best-interest factors set out in Section 36-6-106(a), and both statutes allow for consideration of any other factors the court deems relevant. *See* ***Thompson v. Thompson***, No. M2011-02438-COA-R3-CV, 2012 WL 5266319, at \*6 (Tenn. Ct. App. Oct. 24, 2012). "[I]n most cases, the analysis and the result would be the same regardless of which set of factors is applied." ***Id.*** In this case, we will consider the factors as relied on by the trial court, as well as two of the factors contained in Tennessee Code Annotated Section 36-6-404(4), as Mother argues that they support her argument on appeal, as discussed *infra*.

The trial court found that "[b]oth parents are capable and have demonstrated they can provide for [the child's] needs, both have contributed to [the child's] care, and, therefore, the Court cannot say one parent has been the primary caregiver as opposed to the other." Both parents take issue with this finding and assert that they are the child's primary caregiver. However, after a thorough review of the record, we cannot conclude that the evidence preponderates against the trial court's finding. The evidence shows that on the whole, each parent has taken a significant role in parenting the child. While both Mother and Father have made some poor choices since entering into the marriage, both parents have worked to provide the child with food, clothing, and medical care. Accordingly, this factor likewise favors neither party.

> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

The trial court found that this factor favors Father because "[Father] offers a stable and satisfactory environment due to his family support and his flexible work schedule. [Mother's] life has been anything but stable or satisfactory since the parties' separation." Since the separation, Mother has moved to Jackson from the marital home in Union City, changed the child's school, changed jobs twice, and entered into several different romantic relationships. In contrast, Father entered into one romantic relationship with only one woman who has children a similar age as the child, maintains the same job, and lives in the same home as during the marriage, which is close to Father's parents home. Mother argues, however, that the evidence of Father's drinking issues and conduct in allowing the child to spend time with Father's girlfriend were not properly considered by the trial court. However, the evidence clearly shows that Mother also had drinking and domestic violence issues during the marriage. In addition, while Father admittedly took the child on vacation with his girlfriend and her kids, both Father and his girlfriend testified that, other than on this particular vacation, they had never spent the night together while Father had the child. In contrast, Mother's ex-boyfriend testified that Mother and the child often slept over at his home, with his other roommates. From the totality of the evidence in the record, we conclude that the evidence does not preponderate against the trial court's finding that this factor weighs in favor of Father.

> (4) The stability of the family unit of the parents or caregivers;

The trial court found that this factor weighs in favor of Father. According to the trial court: "[Father's] mother and father both testified and expressed their willingness to support [Father] and [the child]. The family attends church regularly . . . . [Mother's] mother testified, her father did not. [Mother's] mother is concerned, but due to being one and one-

half hours away, she cannot provide ongoing support."As found by the trial court, Father's parents live close to Father and are willing and able to care for the child as needed. Mother has no family support system where she has chosen to live. Mother's job and her commute mean that she must be at work for over twelve hours per day. Accordingly, Mother employed a nanny at times to care for the child during her work day. In contrast, if the child were to attend school in Union City, Father's flexible work schedule and family support would be present for the child. While we do not condemn Mother for seeking to be independent, the paramount question in this case is the best interests of the child, rather than the best interests of the parents. *See Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. Ct. App.1997) (noting that in child custody cases, "the interests of the parents are secondary to those of the children") (citing *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992)). From the record, we cannot conclude that living in an area with little to no family support is more advantageous to the child than to be surrounded by family members who the child knows and loves. Accordingly, the evidence does not preponderate against the trial court's finding that this factor weighs in favor of Father.

> (5) The mental and physical health of the parents or caregivers;

The trial court found "no significant mental or physical health issue of either parent." Mother again points to what she deems Father's excessive drinking, but otherwise "cannot disagree with the findings of the court." We have previously discussed Father's, as well as Mother's, drinking. Because both parents have engaged in poor decision making during the marriage and the separation, we must conclude that the evidence does not preponderate against this finding. Accordingly, this factor weighs in favor of neither party.

> (6) The home, school and community record of the child;

The trial court found that the child was doing well at the college preparatory school in which Mother had enrolled him. The trial court, however, made no specific findings as to which parent this factor favored. Because the trial court found that the child was doing well in the school in which Mother enrolled him, we must conclude that this factor favors Mother. We note, however, that Mother testified that the proposed school in Union City was a "good place" for the child.

> (7)(A) The reasonable preference of the child, if twelve (12)
> years of age or older;

Because of the child's young age, this factor is not applicable. Therefore, it favors neither party.

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

The trial court found that while "both parents have been physically and verbally abusive to each other, neither has been abusive to [the child]." Mother argues, however, that Father's abuse of her often occurred in the presence of the child and, therefore, argues that this factor should weigh in her favor. We note that "[c]ustody decisions are not intended and should not be designed to . . . punish [parents] for their human frailties or past missteps," *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006); *Kesterson v. Varner*, 172 S.W.3d 556, 561 (Tenn. Ct. App. 2005); *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000). The evidence in the record shows that Mother and Father had a very volatile relationship, which escalated to violence on more than one occasion. Because each party exhibited violence toward the other, neither can be excused from blame for the marriage's demise. The evidence also shows that neither parent has ever attempted to harm the child in any way. Accordingly, the evidence does not preponderate against the trial court's finding as to this factor.

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child;

The trial court specifically found that Father's parents were suitable persons to care for the child. The trial court, however, noted that neither Mother's father nor the nanny she had hired were called to testify. The trial court did not specify which parent this factor favors. While we agree that Father's parents are suitable persons to care for the child, Father presented no evidence that either Mother's father or the nanny were unsuitable. Accordingly, this factor favors neither party.

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in

violation of a court order.

The trial court found that:

> [B]oth parents have threatened to withhold [the child] from the
> other and "you will never see him again." When the parties
> separated, [Mother] withheld the child until suit was filed on
> November 12, 2012, and the attorneys were able to enter into a
> consent order. [Father] sends [Mother] birthday and Mother's
> Day cards for [the child.]

The trial court, however, did not make a specific finding as to which parent this factor favored. From the totality of the evidence, we must conclude that both parents have exhibited behavior tending to discourage a close relationship with the other parent. Mother admitted that she denied Father visitation after the separation until after she had retained an attorney. In addition, the evidence shows that Father sent Mother a text message in which he informed Mother that he was planning to tell the child that Mother had interfered with the child obtaining a gift. Thus, this factor favors neither parent.

The trial court considered no other factors. Mother, however, argues that consideration of the additional factors contained in Tennessee Code Annotated Section 36-6-406 weigh in her favor. This Court has previously held that the factors contained in Tennessee Code Annotated Section 36-6-106(a) and Section 36-6-404(b) are generally interchangeable. *See **Thompson***, 2012 WL 5266319, at *6 (noting that the outcome is usually the same regardless of which factors the trial court utilizes). Accordingly, the trial court was entitled to rely on either set of factors and did not err in only considering the factors contained in Tennessee Code Annotated Section 36-6-106(a). However, in order to perform a thorough review of this case, we will additionally consider the factors in Tennessee Code Annotated Section 36-6-404(b) that Mother argues are in dispute.

> [(11)] The parent's ability to instruct, inspire, and encourage the
> child to prepare for a life of service, and to compete
> successfully in the society that the child faces as an adult;

Mother argues that this factor favors her because she values education more than Father as she has a college degree whereas Father was suspended from college for failing grades. In addition, Mother argues that she cares more about the child's education because she enrolled the child in a college preparatory school. While we agree that Mother appears to care substantially about the child's education, even Mother agreed that the proposed school in Union City is a good school for the child to attend. In addition, while Father's own college

endeavors proved unsuccessful, nothing suggests that Father does not value education for the child. Further, beyond school, Father testifies that he exposes the child to a church environment, which may help the child prepare for a life of service. Accordingly, we conclude that this factor favors neither parent.

> [(12)] Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings; . . . .

The trial court did not specifically consider this factor at trial. Interestingly, Mother raises this factor on appeal despite the fact that it was Mother, not Father, who had failed to attend parent education classes at the time of trial. At the beginning of trial, the trial court noted that Mother should have attended the class prior to trial. However, the trial court did not find Mother's failure to attend as a factor weighing against naming Mother primary residential parent. It was undisputed that Father had attended the class prior to trial. Nothing in the record indicates that Mother's failure to attend the class was the result of willfulness. Accordingly, this factor also favors neither party.

Based on the foregoing, the majority of the factors in this case, factors 1, 2, 5, 7, 8, 9, 10, 11, and 12, favor neither party. Factors 3 and 4, regarding continuity and stability, favor Father. Tennessee courts have repeatedly held that continuity and stability are "important factors" in determining which parent to name primary residential parent. *See, e.g., In re Sidney J.*, 313 S.W.3d 772 (Tenn. May 10, 2010); *Richards v. Richards*, No. E2010-00521-COA-R3CV, 2011 WL 2135432 (Tenn. Ct. App. May 31, 2011); *In re Horner*, No. E2002-00588-COA-R3JV, 2003 WL 1452997 (Tenn. Ct. App. March 21, 2003); *King v. King*, No. M2000-00424-COA-R3-CV, 2001 WL 1035175 (Tenn. Ct. App. Sept. 11, 2001). Thus, these factors hold great weight. Finally, only factor 6, regarding the child's school record, favors Mother. However, the trial court noted that the child was at such a young age as to not have a detailed school record and even Mother admitted that the school in Union City was suitable for the child. Thus, the majority of factors which favor one party alone favor Father. However, this Court has held that:

> Ascertaining a child's best interests does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of [one parent or the other]. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and [his or her parents], the consideration of one factor may very well dictate the outcome of the analysis.

***In re Audrey S.***, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (applying the above doctrine in a termination of parental rights case). In this case, the trial court named Father the primary residential parent. As previously discussed, we are constrained to affirm the trial court's designation of primary residential parent unless the decision amounts to an abuse of the trial court's discretion. *See **Eldridge***, 42 S.W.3d at 85. The evidence in the record shows that both parents have close and loving relationships with the child and both parents have served as the child's primary caregiver. However, the record also shows that Father has a larger support network in Union City than Mother has in Jackson, and that since the separation Father has been the more stable influence in the child's life. Based on the evidence in the record, we cannot conclude that the trial court abused its discretion in naming Father the primary residential parent.

Mother's next issue concerns the trial court's failure to impute income to Father for the use of a home, rent-free, from Father's parents/employers. Mother cites ***Wade v. Wade***, 115 S.W.3d 917 (Tenn. Ct. App. 2002), to support her argument. ***Wade*** involved the calculations of a father's income for child support purposes based on non-taxable benefits he received through his service in the military. ***Id.*** at 922–23. The parties introduced evidence regarding the exact amounts Father received in fringe benefits and the specific tax consequences to each benefit. Thus, the appellate court was easily able to include this income in the calculation of the father's child support obligation. ***Id.*** at 923–24. In this case, however, Mother presented no evidence regarding the reasonable rental value of the property that Father occupies. Without any evidence of the rental value of the home, the trial court was simply unable to impute income to Father based on the housing provided to him from his parents/employers. Thus, even assuming, *arguendo*, that Mother successfully established that the use of the home is a fringe benefit of Father's employment, Mother failed to introduce sufficient evidence from which the trial court could have imputed income to Father on that basis. The trial court's calculation of child support is, therefore, affirmed.

For the foregoing reasons, the judgment of the Obion County Chancery Court is affirmed. This cause is remanded to the trial court for further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are assessed to Appellant Jennifer Rose Wood, and her surety.

_____
J. STEVEN STAFFORD, JUDGE
